MAILED TO COUNSEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                                    :
In re Application of Vera Moreno    :
                                    :
-----------------------------------x
LOUIS MILBURN,                      :
                                    :     79 Civ. 5077 (LAP)
                      Plaintiff,    :
                                    :     FINDINGS OF FACT AND
          v.                        :     CONCLUSIONS OF LAW
                                    :
THOMAS A. COUGHLIN, III, et al.,    :
                                    :
                      Defendants.   :
-----------------------------------x

LORETTA A. PRESKA, Chief United States District Judge:

FINDINGS OF FACT

I.   The Parties

     Plaintiff John Vera

          1.  Plaintiff John Vera was an inmate at Green Haven

     Correctional Facility ("Green Haven"), a facility run

     by the New York Department of Correctional Services

     ("DOCS"), from approximately May 2003 to September 16,

     2010.  (Tr. 29:6-8 (Vera); DOCS Inmate Lookup,

     available at http://nysdocslookup.docs.state.ny.us/

     kinqw00; Ex. 20 at 580-81.)[1]  Vera received parole for

     good behavior in prison and is currently on probation.

---

[1] All references to "Tr." refer to the transcript of the hearing
conducted on September 22 and 23, 2010.  Except where noted,
references to "Ex." refer to Vera's exhibits.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/15/10

(Tr. 29:11-15.)  If he violates the terms of his

probation, he will return to Green Haven as an inmate.

(Tr. 29:20-23.)

Defendants

2.  Defendant Frederick Bernstein is the Facility

Health Services Director of Green Haven.  (Joint

Stipulation of Facts ("Joint Stipulation"), Ex. A to

Pretrial Order, ¶ 3.)  In that position, he has

ultimate responsibility for the entire Green Haven

Medical Department, including primary care physicians

and the Medical Records Department.  (Id.; Tr. 172:5-

22 (Bernstein).)

3.  Defendant Hari Chakravorty is a clinical physician

at Green Haven.  (Tr. 95:25-96:1.)  From approximately

early 2005 until Vera's discharge from Green Haven on

September 16, 2010, he was Vera's primary care

physician.  (Tr. 43:18-44:2 (Vera); Ex. 33

(referencing Dr. John Bendheim on 12/17/2004); Ex. 34

(referencing Dr. Hari Chakravorty on 3/22/2005).)

4.  The remaining named defendants, Brian Fischer,

Lester Wright, Robert Ercole, Carl Koenignsmann, E.J.

Licerio, and Chabra Vinot, are all employees or

officials of DOCS and/or of Green Haven and thus are

2

successors to the original defendants under the
Stipulation for Entry of Modified Final Judgment by
Consent ("Consent Decree") § I(4), Milburn v.
Coughlin, 79-cv-5077 (S.D.N.Y. Sept. 30, 1991).

II.  Vera's Condition

Vera's Pituitary Adenoma

5.  Vera has a medical condition called pituitary
adenoma, which is tumor on the pituitary gland in the
brain.  (Medical Problem List, Ex. 21, at 618.)  A
pituitary adenoma is a serious condition that can
disturb normal pituitary function, causing myriad
severe side effects throughout the body, including
loss of vision and seizures.  4 Gale Encyclopedia of
Medicine 2913-14 (2006 ed.).

6.  As Defendants have conceded, Vera's condition
"could be fatal" if not properly treated.  (Bernstein
Declaration, Ex. 3.)  The condition, and the care it
requires, is complex.  (Tr. 144:11-12 (Chakravorty)
(admitting that Vera's care is "quite complicated").)

Chronology of Vera's Condition

7.  In the 1980s, Vera had a pituitary adenoma that
caused him to lose his vision.  (Tr. 30:5-31:10
(Vera).)  Vera's doctors recommended immediate

3

neurosurgery to remove the tumor, and Vera was operated on within a matter of months. (Tr. 31:13-24 (Vera).) After the surgery, Vera's symptoms entirely disappeared; he required no medications and no longer required glasses. (Tr. 32:11-15 (Vera).)

8. However, while incarcerated in the New York DOCS system (but before his incarceration at Green Haven), Vera began again to experience symptoms similar to those that preceded the diagnosis of his first brain tumor. (Tr. 33:15-34:3 (Vera).) He was not given a diagnosis but was prescribed cortisone. (Tr. 34:15-22 (Vera).) At least by the time Vera was transferred to Green Haven's custody in May 2003, Vera's physicians were aware that his tumor had regrown. (See, e.g., Ex. 75 (noting "regrowth of pituitary tumor").)

9. Prior to his incarceration at Green Haven, Vera was incarcerated for approximately a year at Clinton Correctional Facility. (Ex. 21.) While at Clinton, Vera was sent to an endocrinologist named Dr. James Desemone. (Tr. 37:22-25 (Vera); Exs. 25, 27, 74). Dr. Desemone requested Vera's medical records to investigate the extent to which his tumor had recurred, and whether it should be treated by surgery,

4

but was not provided them.  (Tr. 38:16-40:4 (Vera);
Ex. 25 ("We need more details . . . . I need records
. . . ."); Ex. 74.)  Dr. Desemone also wrote, and
conveyed to Vera, that he might need surgery in the
imminent future.  (Ex. 27 ("Would recommend
neurosurgical evaluation re. potential for repeat
surgery . . . ."); Tr. 38:22-39:4 (Vera).)

10. While being treated by Dr. Desemone, but before the
needed investigation could be completed, Vera was
transferred to Green Haven.  (Tr. 41:1-3 (Vera); Ex.
20, at 580-81 (indicating transfer between 3/26/03 and
5/29/03).)  His initial primary care physician was Dr.
John Bendheim, whom Vera understood to be concerned
about his symptoms, including broken bones. (Tr. 41:4-
43:17 (Vera).)  Dr. Bendheim prescribed Fosamax to
Vera, which Vera understood to be intended to remedy
the consequences of his long-term use of cortisone.
(Id.)

11. Around 2005, however, Vera was transferred to Dr.
Chakravorty as his primary care physician.  (Tr.
43:25-44:2 (Vera).)  Dr. Chakravorty was dismissive of
Vera's complaints, failed to order appropriate follow-
up care, and was abusive toward Vera.  (Tr. 44:3-46:9

(Vera).)   Indeed, Vera requested that a correctional
officer supervise all of his evaluations by Dr.
Chakravorty.   (Tr. 45:23-46:9 (Vera); Tr. 86:21-87:12
(Vera Cross).)

12. Throughout his incarceration at Green Haven, the
symptoms and health conditions that Vera experienced
as a result of his prior surgery and of the recurrence
of his pituitary adenoma worsened considerably.   (Tr.
46:10-15. (Vera).)   In addition, there was evidence
during that time that Vera's tumor was growing, (Ex.
32, at 316-18 ("The height of the pituitary lesion has
increased . . . .").), that it was mineralizing or
calcifying (Ex. 59; Tr. 52:13-53:2 (Vera) (testifying
that doctor at Westchester Medical Center stated that
tumor was calcifying)), and that it was impairing
Vera's vision (Ex. 51 (describing results of visual
fields test as being "consistent with the presentation
of a pituitary tumor").

Symptoms Suffered by Vera

13. Vera suffers from a multitude of symptoms.   (Motion
for Contempt Order ("Motion"), Ex. 1 (listing
symptoms); Motion, Tab G (grievances attaching list of
symptoms).   Among the most severe conditions and

6

symptoms suffered by Vera are hormonal deficiencies
(having a variety of effects), losses of
consciousness, vision loss, and low bone density
resulting from long-term hormone replacement
(resulting in bone fractures).

14. Vera has severe hormonal deficiencies.  ((See,
e.g., Ex. 21, at 618 (listing hypothyroidism as
"medical problem" suffered by Vera); Tr. 97:15-24
(Chakravorty) (describing "deficiency in many, many
hormones in the body").)  For someone with such
deficiencies, continued monitoring by an
endocrinologist is critical.  (Tr. 98:4-5
(Chakravorty) (testifying that "there may be a re-
growth of the pituitary tumor, but that is followed
mostly by the endocrinologist and by MRIs"); Tr.
227:23-228:19 (Bernstein) (explaining that
endocrinologists monitor the care of patients
following pituitary surgery and evaluate medication
for hormonal imbalances and whether they are working
or not working).)

15. Endocrinologists have prescribed medications to
treat Vera's hormonal deficiencies, and those
medications, as well as their dosages and their side

effects, must be monitored very closely.  (Tr. 146:12-25 (Chakravorty) (describing adjustments to dosages over time, and that endocrinologist must determine proper medications); Tr. 126:17-127:3 (Chakravorty) (listing medications taken by Vera at a certain point in time).)

16. Vera has experienced a number of episodes in which he lost consciousness.  (Tr. 46:15-16 (Vera); Tr. 106:1-3 (Chakravorty).)  Some of these have resulted in serious injuries to him.  (Tr. 46:17-18.)  For example, in May 2006, he lost consciousness while lining up for breakfast, fell forward, hit his face on the floor, and fractured the bone around his eye socket.  (See, e.g., Tr. 49:2-53:10;  Ex. 132 (Unusual Incident Report); Ex. 80 (Ambulatory Health Record ("AHR") entry); Exs. 55, 56, 57, 58 (records from Westchester Medical Center); Ex. 133 (FHS1 trip/triage report).)  Vera was hospitalized and required surgery.  (Id.)  In August 2009, Vera again lost consciousness and fell, causing further severe injury to his face.  (Tr. 54:1-56:22 (Vera); AHR, Ex. 22, at 120; Ex. 69 (MRI report from Putnam); Ex. 72 (canceled referral noting incident).)

17. Vera has also experienced vision loss.  (Ex. 50 ("[Patient] with pituitary tumor has visual field loss."); Ex. 51 (Visual field test is "consistent with presentation of a pituitary tumor); Tr. 161:9-14 (Chakravorty) (acknowledging conclusion of vision loss).)  Such loss may result from a pituitary tumor that encroaches on the optic nerve. (Tr. 118:8-12 (Chakravorty) (testifying that pituitary tumors can cause problems to the optic nerve).)

18. Vera has also suffered from dangerously low bone density, a side effect of cortisone, one of his hormonal medications.  (Bone Densitometry Report, Ex. 65, at 201; Tr. 112:1-6 (Chakravorty) (noting that osteoporosis is a side effect of Vera's medication).) This puts him at severe risk of bone fractures, which he has suffered.  (Tr. 42:3-4.)

19. In addition, Vera has experienced a variety of other symptoms, including muscular and joint pain, dizziness, and gastrointestinal pain.  (See, e.g., Motion Tab G (attaching symptoms list); Ex. 35 (AHR notation of dizziness); Ex. 45.)

## III. Specialty Care Practices

Record-Keeping Related to Specialty Care

20. Because Green Haven does not employ medical specialists as facility staff, it refers inmates in need of specialty care to private medical providers with whom DOCS has contracted. (Joint Stipulation ¶ 17.) Referrals to such specialists originate with an inmate's primary care physician, who makes an entry on the inmate's AHR and fills out the top portion of a form called a Report and Request for Consultation ("R&ROC"). (Id. ¶ 18(a)-(b).) A carbon copy of that R&ROC travels with the inmate to the specialist appointment. (Id. ¶ 18(g).) After evaluating the inmate, the specialist writes onto the bottom portion of the R&ROC, among other information: a description of the inmate's medical condition, requests for further information, and recommendations for follow-up care. (Id. ¶ 18(h).)

21. The completed R&ROC is provided to the inmate's primary care doctor, who, under Green Haven and DOCS policy, reviews it and records any action or inaction on the specialist's recommendations in the AHR. (Id. ¶ 18(j); Health Services Policy Manual ("HSPM"), Ex.

13, at 1.43.)  The original R&ROC is placed into the inmate's medical file.  (Joint Stipulation ¶ 18(j).)

22. DOCS maintains a computer system called FHS1. (Joint Stipulation ¶ 14.)  FHS1 contains, among other information, entries for inmates' medical appointments with specialists or with their primary care doctors. (Id.)

23. Referrals are not entered into FHS1 until they have been approved by the Regional Medical Director; if disapproved, only a paper record exists.  (Kelly Dep. Tr. 98:25-100:13.)  For each referral that is approved, a member of the Green Haven administrative staff creates an entry in FHS1.  (Joint Stipulation ¶ 18(f).)

24. When the R&ROC containing the specialist's notes returns to Green Haven following the inmate's consultation, a clerk enters a highly abbreviated version of the specialist's evaluation and recommendations into FHS1.  (Id. ¶ 18(i); Tr. 186:6-9 (Bernstein) (stating that FHS1 provides a "sometimes abbreviated reason for the consultation, and then often very abbreviated synopsis of the recommendation by the specialist"); Persson Dep. Tr. 94:8-20

11

(description of limited amount of space in FHS-1).
These FHS1 entries may omit the specialist's
recommendations.  (Tr. 150:20-153:4 (Chakravorty)
(observing recommendation on R&ROC that does not
appear in FHS1); Kelly Dep. Tr. 131:23-133:22
(description of transcription of R&ROC recommendations
into FHS1).)

25. The FHS1 summaries of specialist visits are
therefore incomplete records of both the number of
specialist referrals and of specialists' evaluations
and recommendations.

IV.  Green Haven's Failures to Refer Vera to Correct Specialists

Failure to Refer for Neurosurgical Evaluation

26. As described in detail below, Green Haven has lost
or destroyed the majority of Vera's medical records
from before mid-2007. (See infra ¶¶ 54-59.)  However,
even the records that do exist demonstrate a number of
deficiencies in Green Haven's care of Vera.

27. Despite the severity of Vera's condition, the
ongoing possibility that his tumor would require
surgical excision, the severe health effects caused by
his underlying condition and his medications, and the
fact that his prior tumor was treated through

neurosurgery, Green Haven only once sent him for
evaluation by a neurosurgeon.  (FHS1 Referral History,
Ex. 20).  Since that single appointment in April of
2004, Green Haven never again sent Vera for
neurosurgical evaluation.  (Ex. 20; Tr. 227:17-19
(Bernstein).)

28. Since that time, Vera's other doctors, including
the endocrinologists with primary responsibility for
monitoring his condition and the success of his
treatment regime (see supra ¶ 14), repeatedly have
recommended neurosurgical evaluation.  Among other
instances, Vera's endocrinologist specifically
recommended neurosurgical evaluation in June 2005,
September 2005, and January 2007.  (Ex. 34; Ex. 43;
Ex. 61; see also Ex. 36 (Dr. Chakravorty's notation
regarding neurosurgical follow-up on June 17, 2005);
Ex. 39 (recommending on June 29, 2005, referral to
neurosurgery if visual fields test is abnormal, which
it proved to be, see Ex. 51); Ex. 54 (recommending
"neuro" evaluation on July 20, 2006); Tr. 150:20-22
(Chakravorty) (acknowledging recommendation for
neurosurgery on September 21, 2005); Tr. 154:7-10

(Chakravorty) (acknowledging recommendation for neurosurgery on January 17, 2007).)

29. Green Haven failed to follow these recommendations despite repeated admissions that endocrinologists are the doctors with primary responsibility for monitoring whether Vera's treatment regime was working. (See supra ¶¶ 14-15.) Green Haven also acknowledged that in other circumstances, it followed endocrinologists' recommendations virtually reflexively. (E.g., Tr. 127:13-15 (Chakravorty) (stating he prescribed medication because the endocrinologist recommended it); Tr. 133:19-25 (Chakravorty) ("[A]ll of [the medications] I was prescribing with the recommendation of specialists."); Tr. 148:10-13 (Chakravorty) (stating he "almost always" followed endocrinologist's recommendations to prescribe certain medications).

30. Moreover, neurosurgical care was readily available. For example, neurosurgeons make specialty care visits to Coxsackie Specialty Care Clinic, where Vera repeatedly has been sent for specialty consultations, approximately once a month. (Persson Dep. Tr. 49:5-13.)

14

31. Due to the adverse inference granted by the Court, it is presumed that there were additional recommendations for neurosurgery that Green Haven ignored.  This is consistent with the other evidence, as Vera testified that several doctors expressed their opinion that his tumor should have been treated surgically and that he should be evaluated by a neurosurgeon to explore the possibility of surgical treatment in the future.  (See, e.g., Tr. 52:13-53:2 (Vera) (testifying that doctor at Westchester Medical Center expressed surprise at lack of surgical treatment and difficulty of operating after calcification); Ex. 31).

Failure to Provide Adequate Endocrinology Care

32. As described, endocrinologists have primary responsibility for monitoring a condition like Vera's. (See supra ¶¶ 14-15.)  Vera was last sent to an endocrinologist on May 22, 2009.  (Ex. 20.)  At that visit, the endocrinologist recommended that Vera be seen again in 6-8 weeks.  (Ex. 67, at 229.)  However, Green Haven not only failed to return him within that time period, it never again returned him to the endocrinologist before his release on September 16,

15

2010.  (Ex. 20.)    The Facility Services Director
changed the request for a follow-up in 6-8 weeks to
"P.R.N.," or "as needed."  (Exs. 66, 67.)   No
explanation of the reason for that alteration appears
in the records, and the records do not indicate that
any Green Haven doctor later assessed whether
endocrinology care was in fact needed.   This was
despite the fact that in August 2009, Vera experienced
a particularly serious loss of consciousness which
resulted in a hospitalization (AHR, Ex. 68, at 120;
Putnam Consultation, Ex. 69, at 47; FHS1, Ex. 72, at
844.)

Failure to Respond to Severe Symptoms

33. On other occasions, Vera's Green Haven physicians
ignored clear signs that other specialty care was
required.  For example, Vera lost consciousness in
October 2005 and received medical attention.  (Ex. 46
(AHR noting blackout).)  Despite Vera's primary care
physician's own notes that he should be referred to a
neurologist, he was not sent.  (Ex. 47 (Chakravorty's
note on 10/20/05 that Vera blacked out in October 2005
and should get neurology consult); Ex. 21 (indicating
no neurology appointment).)  In mid-May 2006, Vera

16

again requested that he be sent to a neurologist to
evaluate his blackouts, but his complaints were
dismissed.  (Tr. 89:12-22 (Vera) ("I told him that I
have the symptoms and they was too difficult for me to
understand . . . . [H]e say, Ah, you don't have
nothing.  I see you another day. . . . And maybe two
weeks later or three weeks later, that's when I got
the accident that I lost consciousness and I got hurt
again."); Ex. 80 (Dr. Chakravorty noting Vera's
requests for care and his own refusal to provide it);
Tr. 157:16-20 (Chakravorty) (noting that Vera
requested to see a neurologist during that visit).) A
mere two weeks later, Vera again lost consciousness,
fell on his face, fractured his eye socket, and
required hospitalization and surgery.  (See, e.g., Ex.
132 (Unusual incident); Ex. 80 (AHR entry); Exs. 55,
56, 57, 58 (records from Westchester Medical Center);
Ex. 133 (FHS1 trip/triage record).)

## Failure to Provide Other Follow-Up Care

34. The limited record that exists contains other
examples of follow-up care that was recommended by
Vera's doctors but never provided by Green Haven.
(See, e.g., Ex. 71 (recommending CTA to investigate

possibility of aneurysm); Ex. 72 (canceling referral
for CTA); Tr. 53:3-14 (Vera) (description of
Westchester neurologist's request that Vera return to
Westchester for follow-up neurology treatment, which
was never provided).)

35. The record also contains other examples of failures
in care and unresponsiveness to Vera's complaints
about his condition.  (See, e.g., Motion at Tab G
(Vera's grievances regarding suspension of
prescription medications and containing his repeated
correspondence to Dr. Chakravorty regarding inability
to obtain prescription refills); Motion at Tab F
(Vera's grievances about other aspects of medical care
and Dr. Chakravorty's treatment); Tr. 164:19-21
(Chakravorty) (testifying that he does not recall Dr.
Bernstein ever talking to him about Vera's
complaints).)

## Failure to Provide Necessary Medical Information

36. Green Haven also repeatedly failed to provide
Vera's doctors with the information they needed to
treat him properly.  For example, Vera's MRI of his
tumor in 2005 showed that the tumor was enlarging.
(Ex. 32.) However, when Vera was sent for a follow-up

18

MRI in 2006, the radiologist reported that "No
previous examination is available for comparison."
(Ex. 53.)  On another occasion, the radiologist
evaluating Vera's bone density test also noted that
"[n]o prior exam is available for comparison," despite
the fact that several such exams had been conducted
(Ex. 65; see Exs. 76, 77, 78 (prior reports).)

37. On numerous other occasions, Vera arrived at
doctor's appointments only to find that his physicians
had not been provided with the medical records they
required to perform an adequate evaluation.  (Tr.
38:14-39:19 (Vera); Tr. 64:18-25 (Vera).)  Instead,
they frequently relied on Vera's own recollection and
understanding about the extent of his condition.  (Tr.
63:17-22 (Vera); Tr. 87:21-23 (Vera) ("I had to
provide all the information, background of what I have
an what I was doing in front of the person."); Tr.
88:9-17 (Vera) (The endocrinologist "don't have no
other papers to look for . . . . They have nothing
else. . . . So it was difficult for me to try to
explain to them how my whole condition was over ten,
15 years, and I was surprised that . . . they don't
have no papers to be able to do a complete

19

evaluation.").)  As a practice, Green Haven relies on inmates to tell their doctors at the intake if they have a pending doctor's appointment.  (Kelly Dep. Tr. 86:3-19.)

38. The deficiencies described above were all evident on the face of the limited available records of Vera's medical care.  By operation of the adverse inference this Court has granted, the missing records are assumed to have deficiencies in care in violation of the Consent Decree. (Tr. 263:9-264:14 (adverse inference finding).)

V.   Green Haven's Loss of a Significant Portion of Vera's Medical Records

Key Categories of Records Maintained by Green Haven's Medical Department[2]

39. Pursuant to DOCS policy, an inmate's file at Green Haven includes at least records from previous New York State institutions where he was incarcerated. (Joint Stipulation ¶ 11; Kelly Dep. Tr. 82:9-21.)

40. The AHR contains, in chronological order, each health encounter between an inmate and a health

---

[2] Certain of these practices are memorialized in the DOCS Health Services Policy Manual ("HSPM"), described in detail infra at ¶¶ 81-85.

provider.  (Joint Stipulation ¶ 8). This includes
entries documenting an inmate's visits to sick call;
his visits with his primary care physician, including
any symptoms about which he complained; the medical
treatment he received; his primary care physician's
decision to adjust his care or prescriptions; and any
emergency attention an inmate received.  (Tr. 220:8-
23, 225:11-226:2 (Bernstein).)  An inmate's visits to
sick call or to the infirmary would only be recorded
on the AHR, not on FHS-1.  (Kelly Dep. Tr. 148:24-
149:21).

41. R&ROCs document visits to specialists.  (See supra
¶ 20.)  As described above, much of the information on
the R&ROCs does not appear in the FHS-1 system.  (See
supra ¶ 24.)  Under standard Green Haven practices,
outside providers retain one copy of each R&ROC.
(Kelly Dep. Tr. 125:14-20; Persson Dep. Tr. 65:12-24.)

42. Other types of documents that can be found in an
inmate's medical file include records of emergency
visits, lab reports, and communications from the
inmate to his doctors or to medical records.  (Joint
Stipulation ¶ 7.)

21

43. On an ad hoc basis, Green Haven "thins" the active files of inmates, removing older records to an "inactive" file. (Joint Stipulation ¶ 9; Bosworth Dep. Tr. 42:21-46:7, 47:12-49:6, 133:8-135:18.) Green Haven generally maintains at least a year of records in the active file, though it can be more if the inmate has a complex condition or, alternately, if the inmate does not have many records. (Id.) Inmates' files are also thinned when the active file is "falling apart." (Id.) There is no index made of the records that are taken out of the active file. (Id.) The inactive records are kept on a separate shelf in the medical records room. (Id.)

44. Pursuant to DOCS policy, an inmate's medical chart is not moved out of the medical records room at Green Haven unless and until the inmate is paroled or dies. (Kelly Dep. Tr. 152:16-24) Only medical and medical records staff has access to medical records. (Id. at 37:21-38:14.) Green Haven has lost records before, however. (Ex. 3; Bernstein Decl. ¶ 17.) Green Haven frequently temporarily misplaces inmate files. (Healy Dep. Tr. 16:19-21:4.)

Green Haven's Practices with Regard to Inmate Review of
Records

45. Pursuant to policy, Green Haven makes records
available for inmates to review upon request.
(Bosworth Dep. Tr. 136:2-11; see also Tr. 66:17-69:25
(Vera).)  A request is scheduled when there is space
available in the examination rooms in the medical
department for a review to take place.  (Bosworth Dep.
Tr. 111:18-117:4.)  The inmate receives a call-out to
go to the clinic, reviews his record under the
supervision of someone from medical records or a
nurse, and indicates which records he wants copied.
(Id.)

46. Inmates such as Vera pay per page for copying their
medical records.  (Tr. 69:17-21 (Vera); Kelly Dep.
Tr. 167:5-7; Ex. 115, 118.)

47. Green Haven never gives inmates access to
electronic records if the inmate does not specifically
ask for them, even if an inmate requests to see all of
his records, and even though the HSPM defines records
as including electronic records.  (Bosworth Dep. Tr.
107:23-109:8; Tr. 199:17-21 (Bernstein) (testifying
that he does not know whether a request for FHS1

23

records has ever been made or whether inmates receive
such records if they do request them).)

Green Haven's Staff's Understanding of the Consent Decree's
Requirements with Regard to Medical Records

48. Dr. Chakravorty did not know that the Consent
Decree pertained to him, though as an employee at
Green Haven, he is specifically included within the
class of Defendants and thus is bound by the Consent
Decree. (Tr. 145:8-16 (Chakravorty); Consent Decree
§ I(4).) Dr. Chakravorty only makes notations in the
AHR "sometimes" when he reviews inmate's chart. (Tr.
147:15-17 (Chakravorty).)

49. Dr. Bernstein did not view the Consent Decree as
defining a "health encounter" to include a doctor's
review of a patient's records. (Tr. 221:2-10.)
However, the HSPM clearly states that such reviews are
"encounters" and must be documented in the AHR.
(HSPM, Ex. 13 at 4.1, at 6.) Dr. Bernstein admitted
that the Consent Decree imposes on Green Haven the
requirements of DOCS policies such as the HSPM. (Tr.
173:24-174:4 (Bernstein) (noting that the Consent
Decree "basically [imposes] the medical records

24

requirements of the New York State Department of Correctional Services.").)

50. Dr. Bernstein lacks familiarity with the Consent Decree's medical records requirements and did not focus on the Medical Records section of the Consent Decree because he understood that Green Haven had been in compliance with those requirements.  (Tr. 216:18-217:9.)

51. Betsy Kelly, who as Nurse Administrator for Green Haven supervises the entire Medical Records staff (Kelly Dep. Tr. 17:16 -18:18), was not given any special training regarding medical records when she became Nurse Administrator (Kelly Dep. Tr. 42:9-18). She does not know if the guidelines for thinning records are written down anywhere.  (Kelly Dep. Tr. 42:9-18.)

52. Green Haven did not maintain appropriate levels of medical records staff pursuant to the Consent Decree at all times.  (Horree Dep. Tr. 33:7-24) (describing being only employee in medical records for nearly a year).)

53. Dr. Chakravorty destroyed documents that could have shed light on Vera's symptoms (Tr. 45:1-11 (Vera) (testifying that Dr. Chakravorty crumpled up his list of symptoms and copies of medical records, calling them "garbage" and physically threw them in Vera's face)).

## A Significant Portion of Vera's Records Are Missing

54. Green Haven has conceded that portions of Vera's medical records are missing. (Ex. 3, Bernstein Decl. ¶ 17 ("[P]laintiff's non-current medical records are not presently in the possession of Green Haven's medical department."); Tr. 10:9-23; Tr. 178:14-17 (Bernstein) (testifying of his awareness that some of Vera's medical records are missing).)

55. Pursuant to DOCS policy (see supra ¶ 49), the section of Vera's medical records lost by Green Haven included not only the records from the beginning of Vera's incarceration at Green Haven in May of 2003, but also records from the New York state institutions where he was previously incarcerated. Before he was incarcerated at Green Haven, Vera was incarcerated at Clinton Correctional Facility, Rikers Island, and Downstate Correctional Facility, among others. (Tr.

33:19-20, 35:22 (Vera); Ex. 21 (Medical Problem List).
Vera was at New York state institutions since 1998,
with the exception of some time spent in federal
custody.  (Ex. 21 (Medical Problem List).)

56. Among the records missing from Vera's medical file
at Green Haven is the entire AHR before June 15, 2007.
(Ex. 22 (active AHR); Healy Dep. Tr. 36:8-16
(acknowledgment that could not find pre-2007 AHR);
Bosworth Dep. Tr. 100:22-101:7) (same).[3]  Vera's AHR
from June 15, 2007 to February 17, 2010 documented
nearly 90 encounters between Vera and Green Haven
health providers.  (Ex. 22 (active AHR).)  Had Vera
had health encounters at a similar rate before June
15, 2007, the missing sections of his AHR from Green
Haven alone would have documented approximately 101
additional encounters with health care providers.
Among these missing records would be records of any
symptoms about which Vera complained.  (Compare Tr.
222:23-226:2 (Bernstein) (admitting that symptoms
would be in the AHR, which is missing), with Ex. 3,
Bernstein Decl. ¶ 3 (stating that medical records

---

[3] June 15, 2007 is approximately six months before Vera first
gave notice of his intent to file this lawsuit.  (Ex. 1, Tab B).

"belie plaintiff's claims," as "[m]any of the symptoms about which plaintiff complains are not documented in the medical records").)  It would also include his visits to sick call, visits with his primary care physician, description of his treatment, his health providers' decision-making regarding his care, the prescriptions he received, and emergency care he received.  (See supra ¶ 40.)[4]

57. Missing from Vera's records are at least dozens of R&ROCs from endocrinologists, ophthalmologists, neurologists, and other specialists.  These R&ROCs contained those specialist's notes of consultation and recommendations for follow-up care.  (Ex. 20 (listing specialty care visits from pre-2007 period); Tr. 225:24-226:2 (Bernstein).)

58. The records missing from Vera's file may also include records of emergency visits, certain labs, and communications from Vera.  (Joint Stipulation ¶ 7.)

---

[4] As counsel represented during the hearing, Vera himself was able to obtain a few selected pages of his pre-2007 AHR through Freedom of Information Law ("FOIL") requests made before Green Haven lost those records.  (Tr. 182:23-183:1.)

28

59. Due to the adverse inference, these missing records
are assumed to be favorable to Vera.  (Tr. 263:9-
264:14.)

Importance of Complete and Accurate Medical Records

60. Prison doctors and specialists rely on complete
medical records to ensure continuity of care, as
regular prison doctors see hundreds of patients, and
specialists often see patients only very occasionally.
(Tr. 142:10-143:9 (Chakravorty) (testifying that he
had no independent recollection of care without
looking at the records); Tr. 143:22-25 (Chakravorty)
(agreeing that because prison doctors see so many
patients, "having the records of each individual
inmate's care [is] so important").)

61. Maintaining comprehensive medical records is
particularly important for a patient with as
complicated a health condition as Mr. Vera.  (Tr.
144:13-17 (Chakravorty) ("Q: So particularly for
someone with a condition as complex as Mr. Vera and
with as many symptoms as Mr. Vera has experienced,
keeping accurate records of his medical condition
across time is particularly important, is it not? A:
Yes."); Tr. 218:19-25 (Bernstein) (agreeing that

29

"maintenance of medical records is important to ensuring continuity of care" because "without adequate records, a treating physician may not be able to understand the other care and diagnoses of other treating physicians"); Turner Dep. Tr. 83:7-8 (noting that medical record "needs to be continuous").)

62. Even very old historical records can be relevant in a case like Vera's.  (Ex. 25 (Dr. Desemone writing "We need more details on the original tumor, at next appt. I need records that include: (1) neural imaging studies, (2) pre-op pituitary hormone levels, (3) op note, (4) path report"); Tr. 41:4-43:17 (Vera) (testifying that Dr. Bendheim sought information on the history of Vera's condition); Persson Dep. Tr. 81:2-82:3 (noting that it is important for continuity of care for specialists to know what treatment an inmate had had previously, even before incarceration). (see also supra ¶ 37).)

63. The evaluations of these specialists is contextual, as the evaluation of Vera's condition may change from one appointment to the next.  (Tr. 159:21-163:17 (Chakravorty) (acknowledging that available records demonstrate specialist's changing evaluation of Vera).

Vera's Access to Records

64. Green Haven never provided Vera with electronic records. (Tr. 70:21-24 (Vera) (testifying that he was never shown printouts of electronic medical records); 71:4-73:14 (Vera) (describing his specific requests for electronic records following Bernstein Declaration); Exs. 104-109 (correspondence related to Vera's requests for computer records referenced in Bernstein's declaration); Bosworth Dep. Tr. 107:23-109:8 (testifying that she never provided computer records to Vera).)

65. Green Haven never provided Vera with access to the inactive file, despite specific requests for historical records. (Tr. 66:17-69:25 (Vera); see, e.g., Ex. 109 (asking for "all petitioner actual and old records"); Ex. 120 (asking for older records).)

66. Green Haven admittedly denied Vera's access to records on some occasions. (Ex. 3, Bernstein Decl. ¶ 16 (admitting delay in providing Vera with access to medical records).)

Green Haven Did Not Diligently Search for Vera's Missing
Records After Discovering That They Were Lost[5]

67. Green Haven did not discover that the records were
missing until after the lawsuit was brought, despite
Vera's previous requests for documents that, in fact,
Green Haven had already lost (Tr. 243:9-15
(Bernstein)) and despite the fact that it was possible
to tell by looking at the chart that it was missing
records, as he had so many medical problems.
(Bosworth Dep. Tr. 94:13-95:2.)

68. The only person who testified to being involved in
an initial search for the records was Elizabeth
Horree, who admitted to having sole responsibility for
medical records during the period that the records
purportedly went missing.  (Horree Dep. Tr. 33:7-24)
(describing being only employee in medical records for
nearly a year).)  Horree herself testified that she
did not look inside each file.  (Horree Dep. Tr.
64:15-65:23.)  Dr. Bernstein testified that he himself
reviewed only Vera's own chart for the missing
records.  (Tr. 179:3-4.)  Dr. Chakravorty, Vera's
primary care physician -- who frequently had his chart

---

[5] The diligence of the search for lost records is irrelevant.
Nonetheless, as a factual matter, the search was not diligent.

in his office -- testified that he did not participate
in the search.  (Tr. 168:8-14.)

69. While several members of the medical records staff
testified that they put out APBs, there is no evidence
that anyone contacted the Coxsackie Specialty Care
clinic, where Vera had received care.  (Tr. 243:20-
244:24 (Bernstein) (admitting that he does not know if
his staff contacted Coxsackie); Tr. 168:15-19
(Chakravorty) (testifying that he did not contact
Coxsackie); Bosworth, Horree Dep. Trs. (passim).)
Indeed, it was not until Coxsackie belatedly responded
to a subpoena issued in this case that Green Haven was
aware that Coxsackie possessed copies of some of
Vera's records that Green Haven had lost.  (Defs. Opp.
to Mot. for Adverse Inference at 6 (noting that
counsel for Defendants was initially informed that
Coxsackie did not retain copies of documents).)

70. No one at Green Haven ever contacted Vera's outside
providers to attempt to obtain copies of the missing
records.  (Tr. 168:10-14 (Chakravorty); Tr. 244:25-
245:5 (Bernstein) (testifying that neither he nor his
staff contacted outside providers.).)

33

71. Even once it discovered that records were missing, Green Haven did not inform Vera of that fact. (Tr. 73:21-74:3 (Vera) (testifying that no one ever told him his records were missing); Tr. 168:5-7 (Chakravorty) (testifying that when he learned records were missing, he did not tell Vera); Tr. 180:5-11 (Bernstein) (testifying that he had no recollection of telling Vera that his records were missing); 245:6-8 (same).) Dr. Bernstein also buried information regarding the missing records in his declaration to the Court, despite his knowledge some "three or four years ago" that portions of Vera's medical records were missing. (Tr,. 178:14-179:13 (Bernstein); Ex. 3, Bernstein Decl. ¶ 17.)

## Instead, Green Haven Retaliated Against Vera for His Lawsuit

72. Green Haven did not give Vera access to documents specifically referenced in Bernstein's declaration even after he requested those documents specifically and noted that he needed them for a lawsuit. (Tr. 71:4-73:14 (Vera) (describing his specific requests for electronic records following Bernstein Declaration); Ex. 104-109 (correspondence related to

Vera's requests for computer records referenced in
Bernstein's declaration); Tr. 240:4-242:17 (Bernstein)
(testifying that he does not recall Vera's requests
for computerized records and "presume[s]" that he did
not confirm that he received copies of those
records).)

73. Both Dr. Bernstein and Green Haven disciplinary
personnel spuriously accused Vera of being in
altercations, when in fact his injuries resulted from
his medical condition.  Dr. Bernstein stated in his
Declaration that Vera's injuries from his May 2006
fall were "consistent with those that would occur
during an altercation with another prisoner," despite
numerous medical and other records that unequivocally
demonstrate that Vera injured himself after losing
consciousness.  (Compare Ex. 3, Bernstein Decl. ¶ 11
(stating that "the seizure was unobserved and there is
no medical or other evidence that a seizure
occurred"), with Exs. 55, 56, 80 (paper medical
records), 133 (FHS1 record), 132 (Unusual Incident
Report), and Tr. 230:1-237:5).)

74. A Green Haven correctional officer charged Vera
with extortion and then intimated that he would drop

the charges if Vera would drop his lawsuit.  (Tr. 56:23-63:22 (Vera); Ex. 142.)  As evidence of the charge of extortion, Green Haven disciplinary personnel pointed to Vera's August 2009 injuries, which they alleged were the result of a fight with the alleged extortion victim.  (Id.) After multiple correctional officers testified on Vera's behalf and presented documentary evidence that Vera was in his cell at the time of the alleged altercation, the charges of extortion were dropped for insufficient evidence.  (Id.)

75. The Court finds Mr. Vera' testimony at the hearing to have been credible.

## CONCLUSIONS OF LAW

I.    Applicable Standards

The Consent Decree

76. Green Haven is subject to the Consent Decree. (Pretrial Order ¶ IV.B.1; Ex. 2).  Green Haven entered the Consent Decree to resolve a class action litigation brought by Green Haven inmates claiming that Green Haven's provision of medical care was so deficient as to violate the inmates' constitutional rights.  (Consent Decree Preamble.)  The Consent

36

Decree governs nearly every aspect of the provision of
medical care at Green Haven.   (Pretrial Order ¶
IV.B.1.)

77. The Consent Decree imposes requirements related to
the provision of specialty care, including by
providing that Green Haven must: (1) send inmates to
specialists when needed  (Consent Decree § VII(B); Tr.
215:18-20); (2) provide specialty care in a prompt
manner, consistent with the severity of the inmate's
condition (Consent Decree § VII(D)(3).); (3) keep
records of all specialty care that is provided (Id.
§ XIII(A)(8); Tr. 215:21-23 (Bernstein)); (4) promptly
review all records of specialty consultations (Consent
Decree § VII(I); Tr. 215:24-216:1 (Bernstein)); (5)
where a specialist requests that an inmate be returned
for follow-up care, provide that follow-up care or
explain why it is not providing it (Consent Decree
§ VIII(G); Tr. 216:2-6 (Bernstein)); (6) document
Green Haven doctors' responses to specialists'
recommendations (Consent Decree § VIII(G); Tr. 216:7-9
(Bernstein)); and (7) ensure that an inmate whose
diagnostic tests are abnormal receives appropriate

37

follow-up care. (Consent Decree § VI; Tr. 216:10-14(Bernstein)).

78. The Consent Decree requires that "[d]efendants shall maintain an individual medical record for each inmate and fully document in the health record each encounter of the inmate with a health care provider." (Consent Decree § XIII(A).) Among other records, Green Haven must maintain an AHR "containing documentation of health care encounters in chronological order" and "consultation reports of specialists." (Id.) The Consent Decree specifies that these steps are required "[f]or the purpose of insuring maintenance of medical records that make possible continuity of care." (Id. § XIII.) As Defendants concede, this term refers generally to the idea that care should be consistent over time and coordinated among treating physicians within different specialties. (Tr. 218:13-18 (Bernstein).) The Consent Decree does not permit Green Haven to discard or destroy records. (Tr. 218:5-7 (Bernstein).)

79. In addition, Green Haven has conceded that the Consent Decree imposes on Green Haven the medical records requirements of DOCS policies. (Tr. 173:24-

38

174:4 (Bernstein) (noting that the Consent Decree "basically [imposes] the medical records requirements of the New York State Department of Correctional Services.").)   Green Haven has also conceded that the Consent Decree requires that inmates have access to their medical records.  (Tr. 174:5-7 (Bernstein) (stating that the Consent Decree's requirements "include the inmate patients having access to their medical records"); Bosworth Dep. Tr. 136:2-11 (same).)

80. The Consent Decree imposes other relevant requirements, including (1) that Green Haven maintain "6 full-time equivalent positions, including one full-time senior medical records clerk, one clerk for monitoring inventory and ordering supplies, one clerk for coordinating and maintaining the records and other documents required by this Modified Final Judgment" (Consent Decree § II(A)(8).); and (2) that "[a]ll health care records shall be securely stored when not in use."  (Id. § XXIII(A)(3).)

Department of Correctional Services Policy

81. Green Haven is bound to follow DOCS policies and procedures related to health services, including specialty care, medical record-keeping, and inmate

39

requests for records.  (Pretrial Order ¶ IV.B.2; Tr.
219:1-16 (Bernstein); Tr. 11:2-5 (Odessky).) Many of
these policies are set forth in DOCS's Health Services
Policy Manual (Ex. 13, HSPM).

82. DOCS policies impose numerous requirements
regarding specialty care, including that an inmate's
primary care physician must review specialty care
consultation reports upon the inmate's return from
receiving care; document the consultant's
recommendations in the AHR; and document any action or
inaction taken on such recommendations.  (Ex. 13, HSPM
§ 1.43 ¶ III(A)(7).)  DOCS policy also requires that
certain documents "must" accompany inmates to all
outpatient care appointments, including copies of
prior consultation reports and relevant lab and
radiology tests.  (Ex. 13, HSPM § 1.43 ¶ III(A)(6).)

83. DOCS policies impose numerous requirements
regarding medical record-keeping.  They require that
facilities keep, for each inmate, an AHR that
documents all health encounters between the inmate and
facility providers.  (Ex. 13, HSPM § 4.1, at 6.)
Encounters are defined to include not only "face-to-
face" contact between provider and inmate but also

40

"non face-to-face encounter[s]," for example, if a provider reviews an inmate's medical chart or lab results.  (Id.)

84. The Consent Decree and DOCS policy require that medical records be comprehensive and accurate, require that original medical records remain at all times in DOCS control, and prohibit destroying or discarding medical records. (Tr. 218:5-7 (Bernstein); Ex. 13, HSPM §§ 4.1, 4.4, 4.5(8), 4.6, 4.8; Consent Decree § XIII.)  Defendants have conceded that this obligation extends to all of Vera's records.  (Defs. Opp. to Mot. for Adverse Inference at 7 ("[D]efendants concede their obligation to preserve all of plaintiff's medical records").)

85. DOCS policies also impose requirements regarding inmate access to medical records and information. (Ex. 13, HSPM § 4.10.)  They provide that, in general, an inmate has a right of access to view and/or obtain a copy of his/her health record.  (Id. ¶ III(A)(1).) Among other things, the policies also provide that an inmate's "health record," to which he may obtain access, includes electronic information stored in FHS1.  (Id. ¶ II(A).)  The policies further provide

41

that if an inmate requests such records, printouts
from FHS1 will be provided.  (Id. ¶ IV(7).)  DOCS
policies also provide that each inmate has "the right
to . . . complete current information concerning [his]
diagnosis, treatment and prognosis in terms [he] can
understand."  (Id. § 1.04 ¶ 4.)

II.  Standards for Awarding Relief

Consent Decree's Provision for Relief

86. The Consent Decree specifically provides that
individual class members may seek relief under the
Consent Decree: "In the event of individual cases of
class members in which health care was not provided in
accordance with this Modified Final Judgment," any
class member "shall have the right," after satisfying
certain procedural requirements, "to seek from the
Court individual injunctive relief as well as any
other remedies available in this Court under the law."
(Consent Decree §  XXIX(D).)  An individual class
member may recover under the Consent Decree "despite
defendants' compliance with the Modified Final
Judgment."  (Id.)

Standard for Finding of Civil Contempt

87. To find a party in contempt of a court order such as a consent decree, the order must be clear and unambiguous, the evidence of noncompliance must be clear and convincing, and the evidence must show that the party has not diligently attempted to comply in a reasonable manner.  N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1351 (2d Cir. 1989).

88. A party's violation of a court order need not be willful for a party to be found in civil contempt. NLRB v. Local 282, Int'l Bhd. of Teamsters, 428 F.2d 994, 1001 (2d Cir. 1970); cf. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (noting that even deliberate indifference to serious medical needs under the Eighth Amendment requires "less than conduct undertaken for the very purpose of causing harm").

89. A civil contempt sanction may serve either to coerce the contemnor into future compliance or to compensate the complainant for losses resulting from the contemnor's past noncompliance.  Terry, 886 F.2d at 1352.

43

Adverse Inference

90. The Court has found that Vera is entitled to an adverse inference as to the contents of the medical records that Green Haven had an obligation to preserve and failed to preserve at least negligently (if not more culpably). (Tr. 263:9-264:14.) Thus, as a matter of law, Vera benefits from "an inference that the lost records would have helped [him] demonstrate his case." (Tr. 264:13-14.)

III. The Provisions of the Consent Decree Concerning the Provision of Specialty Care and the Maintenance of Medical Records Are Clear and Unambiguous

91. As described above, the Consent Decree sets forth specific and detailed requirements concerning Green Haven's provision of specialty care and the maintenance of medical records.

92. These provisions are not open to interpretation, and, indeed, Defendants have not argued that they are. Defendants' representatives have concurred with Vera's interpretation of several crucial provisions of the Consent Decree and have advanced no alternate interpretation of any others. (See, e.g., Tr. 219:1-16 (Bernstein); Defs. Opp. to Mot. for Adverse

44

Inference at 7 ("[D]efendants concede their obligation
to preserve all of plaintiff's medical records").)

93. Defendants have also conceded that the Consent
Decree imports binding DOCS policies with respect to
medical care and record-keeping.  These requirements
also are clear and unambiguous.

IV.  The Evidence of Green Haven's Non-Compliance Is Clear and
Convincing

The Evidence of Green Haven's Failure to Abide by the
Specialty Care Provisions of the Consent Decree Is Clear
and Convincing

94. The available medical records demonstrate, and
defendants have not refuted, that Defendants' failure
to refer Vera to a neurosurgeon despite the
recommendations of his endocrinologists and others
violated the following sections of the Consent Decree:
VII(B) (obligation to send inmates to specialists when
needed); VII(D)(3) (obligation to provide specialty
care in a prompt manner, consistent with the severity
of the inmate's condition); VIII(G) (obligation to
document Green Haven doctors' responses to
specialists' recommendations); and VI (obligation to
ensure that an inmate whose diagnostic tests are

45

abnormal receives appropriate follow-up care). (See
supra ¶¶ 26-31.)

95. The available medical records demonstrate, and
defendants have not refuted, that Defendants' failure
to refer Vera to an endocrinologist since May 2009
despite the endocrinologist's recommendation that he
return for follow-up care violated the following
sections of the Consent Decree: VII(B) (obligation to
send inmates to specialists when needed); VII(D)(3)
(obligation to provide specialty care in a prompt
manner, consistent with the severity of the inmate's
condition); VIII(G) (obligation to document Green
Haven doctors' responses to specialists'
recommendations); VIII(G) (where a specialist requests
that an inmate be returned for follow-up care, provide
that follow-up care or explain why it is not providing
it). (See supra ¶ 32.)

96. The available medical records demonstrate, and
defendants have not refuted, that Defendants' failure
to refer Vera to an appropriate specialist after his
losses of consciousness resulting in severe injuries
violated section VII(B) (obligation to send inmates to
specialists when needed) and VII(D)(3) (obligation to

provide specialty care in a prompt manner, consistent
with the severity of the inmate's condition) of the
Consent Decree. (<u>See</u> <u>supra</u> ¶ 33.)

97. The available medical records demonstrate, and
defendants have not refuted, that Defendants' other
failures to follow up on recommended care and to
provide specialists with the appropriate documentation
violated sections VII(B) (obligation to send inmates
to specialists when needed); VIII(G) (obligation to
document Green Haven doctors' responses to
specialists' recommendations); and VI (obligation to
ensure that an inmate whose diagnostic tests are
abnormal receives appropriate follow-up care) of the
Consent Decree. (<u>See</u> <u>supra</u> ¶¶ 34-35.)

98. Additionally, due to the Court's finding of an
adverse inference, the missing records relating to
specialty care -- including (a) the dozens of missing
R&ROCs, (b) referrals to specialty care in the AHR
that were not entered in FHS1 because they were not
approved by the Regional Medical Director, and (c)
documentation (or lack thereof) regarding decisions by
Green Haven physicians to follow or disregard
specialists' recommendations -- are assumed to

47

demonstrate violations of these provisions of sections VII and VIII of the Consent Decree. (See supra ¶¶ 36-38.)

## The Evidence of Green Haven's Failure to Abide by the Medical Records Provisions of the Consent Decree Is Clear and Convincing

99. Defendants have conceded both that a substantial portion of Vera's records have been lost and that Defendants were negligent in losing the records. (Tr. 258:16-19 (Defendants' concession in oral argument that "there was some negligence"). As only employees of Green Haven's Medical Department were allowed to have access to inmates' medical records and as they were required to maintain these records (see supra ¶ 44), no alternate explanation besides Green Haven's negligence existed.[6] As the Court suggested, the evidence of negligence is akin to res ipsa loquitur. (Tr. 259:15-17.)

---

[6] Defendants abandoned an earlier unsupported and wholly implausible theory that Vera stole his own medical records. Compare Def. Opp. to Mot. in Limine at 7 (stating that "defendants are not seeking to have the Court draw any inference," including regarding the allegation of theft, from the missing medical records)), with Ex. 3, Bernstein Decl. ¶ 18 (suggesting that it is "certainly possible" that Vera could have stolen his medical records at a record review), and Def. Mem. of Law in Opp. to Mot. for Contempt at p. 13-14.

100. This negligent loss violated Defendants'
obligation under section XIII(A) of the Consent Decree
to "maintain an individual medical record for each
inmate and fully document in the health record each
encounter of the inmate with a health care provider"
and to maintain the specific records enumerated in
section XIII(A)(1)-(8) of the Consent Decree.

V.   The Evidence Demonstrates That Green Haven Has Not
Diligently Attempted to Comply with the Specialty Care and
Medical Records Sections of the Consent Decree in Vera's
Case

The Evidence Demonstrates That Green Haven Was Not Diligent
in Attempting to Comply with the Specialty Care Provisions
of the Consent Decree in Vera's Case

101. The available records indicate (and, pursuant to
the adverse inference, the missing records are assumed
to indicate) that Green Haven's failures to abide by
the specialty care provisions of the Consent Decree
were not merely technical violations but were
significant departures from a proper standard of care.

102. Defendants repeatedly ignored the clear
recommendations of specialists with expertise on
Vera's condition and primary responsibility for

49

monitoring it.  They repeatedly failed to coordinate

his care and track it appropriately over time.  And

they ignored the fact that Vera's symptoms worsened

throughout his incarceration.  They also repeatedly

refused to take Vera's complaints seriously, as when

Dr. Chakravorty crumpled up Vera's list of symptoms

and copies of medical records and as when, only two

weeks before the May 2006 syncopal episode, Dr.

Chakravorty documented his scorn for Vera's concerns.

(See supra ¶ 33.)

103. Defendants' violations spanned a period of

multiple years and violated several different

provisions of the Consent Decree.

### The Evidence Demonstrates That Green Haven Was Not Diligent in Attempting to Comply with the Medical Records Provisions of the Consent Decree in Vera's Case

104. The evidence demonstrates that Green Haven

employees are not familiar with the provisions of the

Consent Decree and DOCS policy as they relate to

medical records.  (See supra ¶¶ 48-53.)  The evidence

also demonstrates that the medical records procedures

used by Defendants result in frequent temporary

misplacement of records.  (See supra ¶¶ 44, 67, 69-

72.)  The evidence further demonstrates that, at the time Vera's records may have been lost, Defendants may have been in violation of the medical records staffing requirements of the Consent Decree.  (See supra ¶ 52.)

105. The evidence demonstrates that Green Haven repeatedly failed to give Vera prompt access to his records and failed completely to give him access to his electronic records, even upon his specific request and reference to ongoing litigation.  (See supra ¶¶ 64-67.)

The Evidence Further Indicates That -- Far from Showing Belated (and Legally Irrelevant) Diligence After Discovering the Loss of the Records -- Defendants Instead Retaliated Against Vera

106. The evidence indicates that Defendants did not discover the missing records until Vera's litigation, did not promptly inform Vera or the Court, did not contact at least Coxsackie Specialty Care Clinic for copies of the missing records, and did not contact outside providers.  (See supra ¶¶ 67-71.)

107. Far from taking Vera's condition and the loss of his medical records seriously, Defendants submitted a declaration that included at least two wholly

51

unsupported and spurious charges against Vera: (a)
that there was "no evidence" that his May 2006
injuries resulted from a fall, instead of a fight,
despite the existence of multiple medical and official
prison records indicating that Vera lost
consciousness; and (b) that Vera stole the medical
records. (See supra ¶¶ 72-73)

108. The evidence further indicates that the charges
by Green Haven disciplinary personnel that Vera's
August 2009 injuries were payback for an extortion
attempt -- dropped after a full hearing and the
presentation of correctional officers as witnesses by
Vera -- were intended as retaliation for Vera's
lawsuit. (See supra ¶ 74.)[7]

VI.  Vera Has Been Harmed by Defendants' Violation of the
Consent Decree

109. The evidence indicates that Defendants' failure
to provide Vera with the appropriate specialty care
has caused Vera pain and damaged Vera's health, as
both his symptoms and the tests of his condition have

---

[7] That counsel for Vera were not provided with these records
after multiple specific and detailed requests and multiple
affirmations by Defendants that no such records existed only
strengthens  the inference that the charges were connected to
this lawsuit.  (Tr. 4:17-7:3.)

worsened over his incarceration at Green Haven.  (<u>See</u>
<u>supra</u> ¶ 12.)  Indeed, the damage to Vera's health may
be irremediable.  (<u>See</u> <u>supra</u> ¶ 6.)

110. The evidence indicates that Defendant's loss of
Vera's medical records and failure to provide his
doctors with the appropriate records has impaired the
continuity of care provided to Vera at Green Haven.
(<u>See</u> <u>supra</u> ¶ 9.)

111. The evidence further indicates that the loss of
Vera's medical records will continue to harm Vera, as
the gap in his medical history will impair his
doctors' ability to provide continuity of care in the
future. (<u>See</u> <u>supra</u> ¶¶ 36-38.)

112. Finally, the evidence indicates that Defendants'
failure to abide by the Consent Decree and subsequent
retaliation against Vera for attempting to demand his
rights under the Consent Decree has caused Vera years
of fear for his health and constant anxiety.

113. Vera has experienced compensable damages as a
result of Green Haven's violations.  Pursuant to an
agreement among the parties and the Court, upon a

finding of liability, Vera will establish the amount
of his damages in a subsequent phase of litigation.

Counsel shall confer and inform the Court by letter no later
than October 22, 2010 how they propose to proceed.


SO ORDERED.


Dated:  October 15, 2010
        New York, New York

                              _Loretta a Preska_
                              LORETTA A.  PRESKA
                              Chief U.S. District Judge