# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LOUIS MILBURN, *et al., for the class of Louis Milburn, et al.*,

                Plaintiffs,

       v.

HENRY S. DOGIN, *et al.*,

                Defendants.

No. 79 Civ. 5077 (LAP)
Hon. Loretta A. Preska
CLASS ACTION

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE THE MILBURN CONSENT DECREE AND IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR MODIFICATION OF THE CONSENT DECREE**

LAW OFFICE OF AMY JANE AGNEW

Amy Jane Agnew
Joshua L. Morrison
24 Fifth Avenue, Suite 1701
New York, N.Y. 10011

WACHTELL, LIPTON, ROSEN & KATZ

Jonathan M. Moses
Justin L. Brooke
Wilfred T. Beaye, Jr.
Getzel Berger
Jessica L. Allen
51 West 52nd Street
New York, N.Y. 10019

*Counsel for Plaintiff Class*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

    A.    Proceedings prior to the Consent Decree's termination .........................................2

           1.    Unconstitutional deprivations of medical care propel the entry of the Milburn Consent Decree. ........................................................................2

           2.    Green Haven's violations of the Consent Decree propel its modification. ...............................................................................................3

           3.    From 1991 through 2015, the UPD fills a key gap in the provision of medical care at Green Haven. ................................................................3

    B.    Proceedings after the Consent Decree was terminated ...........................................5

           1.    In 2015 and 2016, following the termination of the Consent Decree, Green Haven quickly dismantles the UPD. ...................................5

           2.    Serious deficiencies have since come to light. .............................................7

           3.    Dr. Homer Venters, a nationally recognized expert on prison healthcare, identifies grave concerns with Green Haven's treatment of disabled prisoners since the abolition of the UPD. ................................9

                 i.    Specialized housing units with dedicated health services are the community standard of care. .....................................................9

                 ii.    Green Haven's current centralized health care system ensures that disabled prisoners will not get necessary access to medical care. ............................................................................10

                 iii.    Green Haven neglects the medical needs of sick and disabled prisoners. .........................................................................12

                 iv.    Several deaths at Green Haven demonstrate the significant issues due to the lack of a UPD. .....................................................17

                 v.    Reinstatement of the UPD would remedy the ongoing deficiencies in medical care at Green Haven. ...............................19

           4.    Defendants' expert overlooks the crucial need for the UPD. ....................19

           5.    Green Haven recently institutes changes contrived to improve its position in this litigation. .........................................................................21

LEGAL STANDARD ........................................................................................22

ARGUMENT ...............................................................................................23

    I.    Defendants are violating Plaintiffs' Eighth Amendment rights to
    constitutionally adequate medical care. ..................................................23

        A.    Plaintiffs suffer from serious medical conditions presenting a
        serious risk of harm, satisfying the objective prong. ..................................25

        B.    Defendants deny Plaintiffs adequate medical care for Plaintiffs'
        serious medical needs, satisfying the subjective prong. ..........................26

    II.    Defendants are violating the Americans with Disabilities Act and the
    Rehabilitation Act. ...............................................................................34

        A.    Plaintiffs have met the "light burden" of proving that DOCCS
        denies its disabled patients meaningful access to medical services...........35

            1.    Plaintiffs are qualified individuals with disabilities......................35

            2.    Plaintiffs are being denied reasonable accommodations. .............36

        B.    Defendants will not be able to prove undue hardship...............................38

    III.    The UPD provisions are narrowly drawn under the PLRA. ..................41

    IV.    An evidentiary hearing is required........................................................44

CONCLUSION...............................................................................................45

# TABLE OF AUTHORITIES

**Cases**

Armstrong v. Newsom,
    484 F. Supp. 3d 808 (N.D. Cal. 2020) ...................................................................42

Bell v. Wolfish,
    441 U.S. 520 (1979) ...........................................................................31 n.6, 33 n.9

Benjamin v. Fraser,
    343 F.3d 35 (2d Cir. 2003) ......................................................................... *passim*

Benjamin v. Horn,
    2006 WL 1370970 (S.D.N.Y. May 18, 2006) .......................................................44

Benjamin v. Jacobson,
    172 F.3d 144 (2d Cir. 1999) (en banc) ...........................................................22, 44

Brock v. Wright,
    315 F.3d 158 (2d Cir. 2003) ...............................................................................24

Cagle v. Hutto,
    177 F.3d 253 (4th Cir. 1999) ..............................................................................45

Cagle v. Sutherland,
    334 F.3d 980 (11th Cir. 2003) .............................................................................27

Chance v. Armstrong,
    143 F.3d 698 (2d Cir. 1998) ...............................................................................24

Coleman v. Schwarzenegger,
    922 F. Supp. 2d 882 (E.D. Cal. & N.D. Cal. 2009) .............................................20

Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.,
    804 F.3d 178 (2d Cir. 2015) ...............................................................................39

Detainees of Brooklyn House of Detention for Men v. Malcolm,
    520 F.2d 392 (2d Cir. 1975) ...............................................................................31

Dodge v. Cty. of Orange,
    282 F. Supp. 2d 41 (S.D.N.Y. 2003) .............................................................42, 44

Estelle v. Gamble,
    429 U.S. 97 (1976) .............................................................................................24

Farmer v. Brennan,
    511 U.S. 825 (1994) ...........................................................................................25

Fleming v. City of New York,
    2019 WL 4392522 (S.D.N.Y. Aug. 27, 2019) ......................................36

Hadix v. Johnson,
    228 F.3d 662 (6th Cir. 2000) .................................................44

Handberry v. Thompson,
    446 F.3d 335 (2d Cir. 2006).........................................41, 43, 44

Langley v. Coughlin,
    888 F.2d 252 (2d Cir. 1989.)......................................................23

Lewis v. Cain,
    2017 WL 4782653 (M.D. La. Oct 23, 2017) ........................................19

Lewis v. Cain,
    2021 WL 1219988 (M.D. La. Mar. 31, 2021) ...........................19, 31 n.6

Loyd v. Alabama Dep't of Corr.,
    176 F.3d 1336 (11th Cir. 1999) ...............................................45

Nimely v. City of New York,
    414 F.3d 381 (2d Cir. 2005)........................................................21

Ramirez v. Bernstein,
    2020 WL 7230729 (S.D.N.Y. Dec. 7, 2020) ..................................35 n.10

Ramos v. Lamm,
    639 F.2d 559 (10th Cir. 1980) ...................................................31

Salahuddin v. Goord,
    467 F.3d 263 (2d Cir. 2006)........................................................24

Todaro v. Ward,
    565 F.2d 48 (2d Cir. 1977)..........................................24, 30, 31

Wright v. New York State Dep't of Corr. & Cmty. Supervision,
    242 F. Supp. 3d 126 (N.D.N.Y. 2017).............................................35

Wright v. New York State Dep't of Corr.,
    831 F.3d 64 (2d Cir. 2016)................................................. *passim*

**Statutes and Rules**

18 U.S.C. § 3626..................................................................... *passim*

42 U.S.C. § 12102.......................................................................35

42 U.S.C. § 12131...................................................................35, 36

U.S. Const. amend. VIII.................................................................................................23

**INTRODUCTION**

When Defendants first sought to terminate the Consent Decree in this case, they represented to this Court that they were effectively and finally meeting the requirements of federal law and that the Consent Decree was no longer necessary. Now, more than seven years later, that is no longer the case. Health care conditions at Green Haven have deteriorated such that the rights of its prisoners are being violated. The Consent Decree must therefore remain in place.

This is particularly so with regard to the Unit for the Physically Disabled ("UPD"), the focus of the first phase of this bifurcated proceeding. The UPD, established on the first floor of Green Haven's C-Block, met the needs of Green Haven's disabled and chronically ill prisoners through accessible facilities and on-unit provision of medical care and medication. But almost immediately after the 2015 order terminating the Consent Decree, Defendants began dismantling the UPD, despite internal concerns that doing so would leave its residents vulnerable. Roughly one year after the termination order, the UPD was completely gone. And, while Defendants told this Court that they replaced the provisions of the Consent Decree with improved systems of care, they did nothing to replace the UPD.

Defendants left Green Haven's disabled and most infirm residents in the exact same system of centralized medical care established for every other prisoner at Green Haven, despite the clear differences in need. This approach violates the rights of those concededly disabled prisoners who continue to reside on the former UPD, because the UPD is located far from the medical unit, thus creating barriers to obtain regular and emergency health care. And this approach violates the rights of those prisoners with significant illnesses who are denied access to the former UPD, despite suffering similar disabilities that would be eased by being housed

on the former UPD.  Green Haven officials even concede that some members of this latter

group are housed in the unit closest to the medical clinic precisely because of their greater need

for health care, despite that unit not being accessible to the disabled.

These serious violations must be remedied.  The UPD is the ready and practical means

to do so, and Defendants' bid to permanently dispense with it should be denied.

## BACKGROUND

**A.     Proceedings prior to the Consent Decree's termination**

**1.     Unconstitutional deprivations of medical care propel the entry of the
Milburn Consent Decree.**

Green Haven Correctional Facility is one of the largest maximum-security state prisons

in New York.  It is located in a sprawling 1940s-era complex of interconnected buildings in

Dutchess County.  In 1979, a prisoner named Louis Milburn filed a pro se complaint alleging

deficiencies in the provision of health care at Green Haven.  (Ex. 1.)[1]  In 1980, Milburn filed

an amended class action complaint on behalf of a class of Green Haven prisoners, alleging

that Green Haven denies them prompt and adequate access to medical care.  (Ex. 2.)  Milburn's

proposed class of "all persons who are or who will be confined at the Green Haven

Correctional Facility" was certified a year later.  (Ex. 3.)

In 1982, the parties reached a comprehensive agreement—the Milburn Consent

Decree—to improve the provision of health care at Green Haven.  After providing the requisite

notice to the class, Judge Ward entered the consent decree and issued judgment.  (Ex. 4.)

---

[1] Citations in the form "Ex. __" refer to the Declaration of Amy Jane Agnew.

## 2. Green Haven's violations of the Consent Decree propel its modification.

In 1990, representatives of the class moved to hold the defendants in contempt for violating the consent decree. Judge Ward appointed Dr. Robert L. Cohen to serve as an independent medical auditor to monitor Green Haven's compliance with the consent decree. (Ex. 5.) Dr. Cohen found that Green Haven was not in compliance with the Consent Decree and recommended modifications designed to improve health care. (Ex. 6.) While evidentiary hearings on the contempt charges were ongoing, the parties agreed to resolve the dispute through a modification of the Consent Decree. Judge Ward approved this modification on September 27, 1991, after finding that it is "fair, adequate and reasonable to all members of the plaintiff class." (Ex. 7 at 4.) The 1991 version of the Consent Decree, (see Ex. 8 ("Consent Decree")), remains the operative version, aside for modifications related to the medical auditor.

## 3. From 1991 through 2015, the UPD fills a key gap in the provision of medical care at Green Haven.

One of the key improvements in the 1991 Consent Decree was the Unit for the Physically Disabled ("UPD"), which is the subject of this stage of the bifurcated litigation. The UPD filled a critical role in the prison healthcare system. As a general matter, DOCCS operates a binary healthcare system, in which a prisoner is housed either in general population in a prison or at a Regional Medical Unit ("RMU"). RMUs are a handful of prison hospitals located throughout the state, in which prisoners receive 24-hour clinical supervision in a hospital setting. In prisons such as Green Haven, however, prisoners are housed in cell blocks that contain no on-unit healthcare presence, and instead must receive all healthcare at the prison medical unit (or, in certain circumstances, at outside hospitals). This binary system leaves out many prisoners—the chronically ill and permanently disabled—who require a higher degree of care than can be provided in general population, yet are not sick enough to

require indefinite 24-hour hospitalization (or infirmary stays) and the limitations that entails. The UPD filled this intermediate need by allowing these men to live in safe, handicap-accessible quarters, with access to nursing assistance and daily medication, while remaining in a regular facility, having the ability to participate in programs available to other prisoners, and not consuming the expensive resources used at an RMU.  (See Declaration of Homer Venters, Ex. 1 ("Venters Rpt.") 7-12.)

In keeping with these principles, the relevant UPD-related provisions in the Consent Decree, (see Consent Decree XVII.), provided as follows:

- The UPD should have a capacity for at least 44 patients.

- Each patient in the UPD should be assigned to a physician for the management and coordination of his care.

- An interdisciplinary UPD committee should meet monthly to assist in the administration of the UPD and to review admission and discharge decisions.

- Green Haven should maintain UPD protocols covering medical treatment.

- Green Haven should maintain a policy for admission and discharge of UPD patients.

- The UPD cells and showers should be handicap-accessible, including grip bars and shower chairs.

- The UPD should have a call-button system in the cell of "any patient who is at substantial risk of experiencing a medical emergency."

- The UPD should have a nurses' station "that will permit UPD patients to have reasonable access to the nurses during all out-of-cell time."

- The UPD should have a treatment room where medical examinations can be conducted.

The UPD at Green Haven was established on the first floor of C-Block.[2]  That floor contained two galleries of cells, called C-1 and C-4 Companies.  The cells in both companies are double the width of a regular cell, to accommodate patients with limited mobility. The cell

_____

[2] An informal schematic of the UPD's layout is attached as Appendix 1.

doors on C-4 company are also wider, which allows wheelchair entry into the cell. C-Block is in Green Haven's west side, far from the medical clinic, which did not matter for the UPD as medical care was being provided on-site. In particular: (a) medications in the UPD were dispensed on-site, instead of requiring disabled patients to spend hours every day wheeling a significant distance through multiple gates to the medical unit to get their medications; (b) sick call and doctor visits took place on the UPD, which assured that UPD patients received prompt medical care by medical staff who were familiar with their ailments and medical needs; (c) a physiatrist visited the UPD weekly for specialty care relating to chronic pain management; (d) physical therapy likewise took place on-unit in the UPD; (e) the on-unit nurse responded quickly to emergencies; (f) UPD healthcare providers conducted monthly meetings to monitor the needs of UPD patients; and (g) UPD providers conducted quarterly evaluations of each UPD patient.

## B. Proceedings after the Consent Decree was terminated

### 1. In 2015 and 2016, following the termination of the Consent Decree, Green Haven quickly dismantles the UPD.

In 2014, Defendants moved to terminate the Consent Decree pursuant to the Prison Litigation Reform Act. (Dkt. 432.) After previous class counsel withdrew the opposition, the motion was granted on March 4, 2015. (Dkt. 461.)

Almost immediately thereafter, Defendants began chipping away at the Consent Decree's UPD requirements, culminating in the official abolition of the unit:

- **August 2015:** Green Haven shortens the time when UPD prisoners could receive medications, resulting in many prisoners missing their required medications. (Ex. 9-10.) Green Haven also removes prisoner health aides—who assisted disabled patients with daily living tasks—from the UPD overnight shift. (Ex. 11.)

- **November 2015:** Green Haven cuts the daytime UPD nursing presence to just one nurse per shift. (Ex. 12.) The UPD interdisciplinary meetings are reduced from once per month to once every two months. (Id.)

- **December 2015:** Green Haven removes the overnight nurse from the UPD. (Ex. 13-14.) Green Haven also disconnects the UPD emergency call bell system. (Ex. 14.)

- **January 2016:** Green Haven reduces the evening nursing shift on the UPD. (Ex. 15.)

- **April 2016:** Green Haven removes the UPD doctor and reassigns UPD patients to other providers. Green Haven also ends the weekly visits by the UPD physiatrist. (Ex. 16 at 1.)

- **May 2, 2016:** The UPD officially ceases to exist. (Ex. 17 at 2.) Green Haven removes all on-site provision of medical care in the UPD and dismantles the nurses' station. (Ex. 18.) On the first day after the UPD's abolition, half of the UPD prisoners do not receive their scheduled medications. (Ex. 91.)

As the UPD's dismemberment was ongoing, a bevy of DOCCS officials and Green Haven personnel expressed concern about these changes or cautioned that further study was required. For example, they wrote:

- "Many of [the UPD] inmates would have a difficult time functioning without the assistance of the aides/medical assistants working on [the UPD]." (Ex. 20.)

- "It is not prudent to pull 24 hour nursing without a thorough review of the patient mix and a determination if all of the patients are appropriate to be there without 24 hour nursing presence." (Ex. 21.)

- "[T]he inmates [in the UPD] would first have to be evaluated to see if they DON'T need [24-hour] nursing" because "inmates are assigned there with the understanding that there is 24 nursing available." (Ex. 22.)

- "Nurses are concerned that due to either lack of nursing rounds and or lack of an emergency call-bell system could put the nurses in a legally compromised position." (Ex. 17.)

- "[The] nursing staff is fearful that staff nurses will be held accountable if an untoward event occurs in their absence." (Ex. 24.)

But these warnings went mostly unheeded—even by the very officials who had voiced them. Nor did Green Haven conduct individualized assessments as to whether the UPD's inhabitants could be formally reclassified into the medical category of prisoners that do not

require 24-hour nursing. Under DOCCS's policy, prisoners who require 24-hour nursing must be classified "Level One" following a medical examination and an individualized determination of that patient's need. (Ex. 73 at 1-2; <u>see also</u> Ex. 36, Deposition of Frederick N. Bernstein (Bernstein Dep.) 196:13-18.) Prisoners who do not require such care are to be classified "Level Two" or "Level Three," also after an individualized determination by a medical professional. The classification system is intended to ensure that patients are placed at facilities that can meet their needs. (Ex. 39, Deposition of Dr. John Bendheim (Bendheim Dep.) 15:10-17:14.) When the UPD was in place, its inhabitants were classified Level One, but after the UPD was terminated in 2016, these patients remained classified as Level One. There was no change in their physical or medical conditions. (Ex. 40 (Deposition of Dr. Lester Silver, June 4, 2021 (Silver Dep. 1) at 25:8-15.) Two years later, in 2018, a nurse at Green Haven discovered this oversight and alerted the DOCCS administration. In response, Green Haven still did not conduct an individualized assessment of the former UPD's inhabitants' medical needs. Instead, Green Haven and DOCCS simply reclassified all of the former UPD's inhabitants, en masse, from Level One to Level Three. (Ex. 25.) There was no individualized assessment—indeed, no assessment at all—of any patient's actual needs.

>        2.      **Serious deficiencies have since come to light.**

The Second Circuit remanded this case in December 2020. The appeal was pursued by a group of intervenors, largely made up of UPD residents who witnessed the changes there after the Consent Decree's termination. On remand, this Court appointed the undersigned as substitute class counsel. This litigation was then bifurcated: The first phase focuses on the UPD, while the second phase will focus on the remainder of the Consent Decree.

Class counsel promptly began discovery into the many allegations relating to the treatment of disabled patients at Green Haven. By now, the UPD has been abolished for over

six years.  Discovery uncovered grave problems with Green Haven's treatment of chronically

ill and disabled patients.  Put simply, Green Haven's most vulnerable prisoners—its

chronically ill and disabled—are not getting the care they need.  And glaringly, even though

Green Haven houses many wheelchair-bound patients who need specialized housing, discovery

revealed that half the cells in the former UPD sit empty and unused, (see Ex. 35, Deposition of

Sabrina Day (Day Dep.) 88:24-89:7), while patients who would benefit from a functioning

UPD are housed elsewhere.

Various ad-hoc rationales for eliminating the UPD have been deciphered from emails

produced in discovery.  One motivation those emails revealed was that, facing a nursing

shortage, Green Haven chose not to hire two new nurses, but instead chose to shutter the UPD

and reassign its two nurses elsewhere in the facility.  (Ex. 18.)  Other emails suggest that the

UPD closure was motivated by wishful thinking that its inhabitants could simply be

"mainstreamed"—i.e., stripped of their accessible accommodations and forced to make do with

the same services provided to healthy prisoners.  (Ex. 19-20.)  Yet another ad-hoc justification

was that the UPD was "redundant" because there was wheelchair-accessible housing elsewhere

in the DOCCS system, despite that the UPD was the only housing unit at Green Haven that

enabled in-cell wheelchair access and had ADA-compliant showers and toilets.  (Ex. 21.)

Whatever the justification, the healthcare provided in the former UPD has greatly

deteriorated since the UPD's closure.  Indeed, while Defendants have told this Court that the

changes brought about by the termination of the Consent Decree "improve[d] the quality and

efficiency of . . . medical care" at Green Haven, (Dkt. 641), the highest-ranking doctor at

Green Haven admits that this is not true for the residents of the UPD:  When asked whether the

termination of the Consent Decree "improve[d] care in the UPD specifically," Dr. Bentivegna said "no." (Ex. 31, Deposition of Dr. Robert Bentivegna (Bentivegna Dep.) 97:13-15.)

### 3. Dr. Homer Venters, a nationally recognized expert on prison healthcare, identifies grave concerns with Green Haven's treatment of disabled prisoners since the abolition of the UPD.

Class Counsel retained Dr. Homer Venters, who recently served as the top medical official for New York City's jails, to render an expert opinion on the provision of medical care at Green Haven. In two lengthy reports, Dr. Venters explained the dire state of healthcare for chronically ill and disabled prisoners at Green Haven who—in the past—would have had their needs met by the UPD. Dr. Venters concluded that "the facilities, processes, and staffing provided by the UPD in the Consent Decree should be restored" because "[f]ailure to provide the level of health care that was provided under the former UPD puts chronically ill or disabled patients at risk of worsening of already severe health conditions, unnecessary suffering and pain, or even death." (Venters Rpt. 3.)

### i. Specialized housing units with dedicated health services are the community standard of care.

Dr. Venters explains the "unmistakable trend towards an aging prison population in DOCCS custody" and that "[a]s the number of older incarcerated people increases, there is a pressing need to provide increased health services and disability accommodation." (Venters Rpt. at 8-9.) For prisoners housed in the former UPD—generally older prisoners with mobility issues and chronic health problems—Dr. Venters explains that the community standard of care is to provide specialized units within the general population, with an on-site healthcare and nursing presence. Dr. Venters cites examples of such units in other prison systems. (Id. at 11.) Dr. Venters explains that such units are a win-win, because they ensure that the prisoners get the care they need, while lowering the risk that they will require a costly hospital stay. (Id.)

ii. **Green Haven's current centralized health care system ensures that disabled prisoners will not get necessary access to medical care.**

Dr. Venters further explains that specialized housing units are particularly appropriate for systems like Green Haven, in which virtually all healthcare is provided in centralized spaces far from housing units. Without a UPD-type unit, Green Haven's centralized system makes it inevitable that disabled prisoners will be deprived of necessary medical care and medications. (Venters Rpt. at 3-4, 12, 46.)

As a maximum-security facility, prisoners cannot travel freely through Green Haven. Each trip to the medical unit—for medication, supplies, clinical care, or emergencies— requires traveling long distances and waiting to pass through many doors, gates, and checkpoints. For disabled prisoners, each journey can take significant time—if it happens at all. This is doubly worse for wheelchair-bound prisoners who cannot propel themselves without help of a mobility assistant, or "pusher," who may or may not arrive as scheduled.

The UPD remedied this problem by allowing for the provision of healthcare and medications on the housing unit. But now, without the UPD, disabled prisoners at Green Haven are denied access to medical care and medications in key ways:

- **Sick call and physical examinations.** To be seen by a provider, a patient must first go to a centralized sick-call unit, located outside the housing blocks, to be seen by a nurse. Then, at a later point, the patient must go to the clinic, which is even further away, to see his provider. Disabled and wheelchair-bound patients often cannot transport themselves to these off-unit locations. When the UPD was in place, this problem was nonexistent due to the provision of on-site care by nurses and providers. (Venters Rpt. at 4, 14, 25, 28, 30-31; See also Dovlatyan Decl. Ex. 47, 49, 53.)

- **Medications.** As Dr. Venters found during his inspection of Green Haven, certain critical medications "must be obtained centrally, which represents at least a 5-10 minute walk for healthy individuals." (Id. at 25; Dovlatyan Decl. Exs. 1-10.) Mr. Lifrieri testified that it take *two to three hours* to make one roundtrip in his wheelchair to obtain the many medications that he is not allowed keep personally. (See Ex. 32, Deposition of Demetrio Lifrieri (Lifrieri Dep.) 35:22-37:11.) As a result, UPD residents frequently miss medications, including critical medicines such as insulin. (Venters Rpt. 21.) And Dr. Venters concludes that "[f]or people requiring canes, walkers or wheelchairs, the

distance and time are a substantial barrier to obtaining needed medication." (Venters Rpt. at 25.) When the UPD was in place, this problem was nonexistent due to the on-site dispensing of medications from the on-site nurses' station. (Id. at 25, 28-31.)

- **Wheelchair "pushers."** Many of Green Haven's wheelchair-bound patients cannot wheel themselves the long distances required to get to sick call or the clinic. For some patients who live in C-4, Green Haven assigns other prisoners to serve as "pushers" to wheel the disabled prisoners to other parts of the prison. But Green Haven routinely denies prisoner requests to obtain pushers. And Green Haven *categorically* denies *all* pusher requests from wheelchair-bound patients who do not live in the former UPD (or on J Block), regardless of demonstrated need. (See Bentivegna Dep. at 263:23-25.) Even with pushers, prisoners still miss medication runs or provider visits if the pusher does not show up. When the UPD was in place, this problem was addressed by having on-site healthcare provision, complemented by pushers as needed. (See Venters Rpt. 17, 21, 25-26; Venters Decl. Ex. 2 Rebuttal Report of Dr. Homer Venters (Venters Rebuttal) at 10, 12; See also Dovlatyan Decl. Exs. 39-46 (images of journey from medical clinic to C Block).)

- **Emergency care.** Multiple DOCCS officials conceded that the patients living in the former UPD are at greater risk of falling and at greater risk of sudden life-threatening medical emergencies like heart attacks, strokes, or diabetic comas. (See, e.g., Bentivegna Dep. 55:23-56:6, 58:11-14, 330:9-18.) When the UPD was in place, each UPD cell had an emergency call button that alerted the on-site nurse, who could respond in seconds. After Green Haven disconnected the call bells and removed the nurses, a prisoner who suffers an emergency must (1) find a way to alert his neighbors, including in the middle of the night when everyone may be asleep; (2) wait for his neighbors to scream and yell to the officer on duty—who can be stationed hundreds of feet away—to summon help; (3) wait for the officer to respond to the cell and call the medical unit; and (4) wait for a nurse to make the journey from the medical unit to the cell block. Altogether, current C-Block prisoners testified that it can take 30 to 60 minutes for emergency help to arrive from the infirmary. (See Lifrieri Dep. 50:8-23; Ex. 43, Deposition of Milan Heggs (Heggs Dep.) 63:3-25, 72:23-73:12; Ex. 45, Deposition of Eugene Mazzio (Mazzio Dep.) 43:17-44:10, 47:22-48:6; Ex. 46, Deposition of Daniel Miller (D. Miller Dep.) 44:15-45:5, 47:18-24; Ex. 47, Deposition of David Rhodes (Rhodes Dep.) 54:20-24, 59:23-60:3.)

Overall, Dr. Venters found that the abolition of the UPD deprives Green Haven's disabled prisoners of their most basic constitutional healthcare rights—the right to be seen by a doctor, the right to obtain medication, and the right to prompt emergency care. As Dr. Venters found: "The centralized model of care now in place at Green Haven, in which medications or sick call, or other necessary elements of health care, is not provided in prisoner housing units

such as the former UPD, makes it predictable that patients with disabilities or who have serious medical problems will not receive adequate access to health care." (Venters Rpt. 4.)

### iii.  Green Haven neglects the medical needs of sick and disabled prisoners.

Though the UPD has been eliminated, Green Haven continues to house many individuals who need UPD-type care due to a combination of mobility issues and chronic health problems. (See, e.g. Bentivegna Dep 218:6-11.) Some of these patients are housed in the former UPD, where they at least have the benefit of accessible facilities, and where they can sometimes get a "pusher" to help wheel them to medical appointments. But many others are dispersed throughout Green Haven's other cell blocks, where they have no accessible facilities, no wheelchair pushers, and cannot even fit their wheelchairs through the narrow doors into their small cells. Indeed, a number of such patients are housed in E Block concededly due to its proximity to the medical clinic—a recognition of the medical risk they face—even though they suffer from serious disabilities that would be better accommodated on the former UPD. (Ex. 32, Deposition of Superintendent Mark Miller (M. Miller Dep.) 178:18-23 (C-4 and C-1 showers are the only wheelchair-accessible showers in Green Haven's general population), 164:9-21 (patients are placed on E-Block to be closer to infirmary); Bentivegna Dep. 263:20-25 (pushers are allowed only on C-Block or J-Block); 327:13-18 (patients who need a lot of medications are put on E and A blocks to be closer to medical unit).)

There are thus two prisoner populations who have suffered from the UPD's abolition: (1) the current inhabitants of the former UPD, who face significant barriers to access medical providers, medications, supplies, and emergency care; and (2) sick and disabled patients housed elsewhere in Green Haven who also face significant barriers to medical providers, medications, supplies and emergency care, *and* are denied the ability to live in safe living

quarters with cells, toilets, and showers that accommodate their disabilities, *and* are categorically denied wheelchair "pushers" that would allow them to go to the clinic or to pick up medications. The first round of discovery focused on these two groups of patients to assess the need for a fully-reinstated UPD.

**Patients living in the former UPD.** Starting with the first category—patients living in the former UPD—Dr. Venters concluded that the termination of the UPD resulted in (a) inadequate access to medical providers and medicine for the residents of the former UPD; (b) failures to provide basic medical supplies—like catheters, colostomy bags, and diapers—that allow these disabled men to maintain their health and dignity; and (c) contrary to Defendants' claim to have made improvements, the termination of the UPD has resulted in extended response times in cases of emergency, jeopardizing the lives of the chronically ill and disabled men who live in the former UPD. These failures are clearly evident, including for the below patient examples, as will be further proven at the evidentiary hearing:

- **Demetrio Lifrieri (wheelchair bound, heart disease, arrhythmias, diabetes, and chronic kidney disease).** Mr. Lifrieri experiences months-long delays in seeing a provider. It can take three to four visits to sick call to see a provider and this process itself could take two to three months. Mr. Lifrieri also testified to delays in emergency responses, and that it has taken 30-45 minutes for someone to come to his cell after yelling for help. In one incident of chest pains occurring around 4:00 a.m., the responding nurse simply told him to follow up via sick call the next day. (See Lifrieri Dep. 146:14-146:23, 148:14-148:23, 50:8-50:23; see also Ex. 49 at 32, 37, 38, 42.)

- **David Rhodes (wheelchair-bound, diabetes, Hepatitis C, neuropathies, chronic pain syndrome, chronic headaches, and carpel tunnel syndrome).** Mr. Rhodes testified that it can take one to two months to get seen by a provider after going to sick call. Mr. Rhodes also testified that it can take 20 minutes for correctional officers to respond to a cell after screaming for help. (See Rhodes Dep. 46:10-46:14, 59:23-60:3; see also Ex. 50 at 45, 47, 49, 50.)

- **Ramel Christian (wheelchair-bound, polyneuropathies, neurogenic bladder, incontinence, and chronic pain).** Green Haven fails to provide Mr. Christian with an adequate number of catheters—in contravention to a DOCCS policy (adopted as a result of federal litigation) that patients must be provided with enough sterile, single-use catheters and supplies to avoid reuse and the inevitable resulting infections. Mr.

Christian has a history of chronic infections and reuse increases the likelihood of infections. (See Venters Rpt. 19-20; Ex. 54 at 14-15.)

- **Eugene Mazzio (wheelchair-bound, epilepsy, chronic pain, bowel and bladder incontinence, diabetes, several amputations of toes, a heart murmur, hypertension, epilepsy, gangrene infections, and severe polyneuropathy).** Mr. Mazzio uses a colostomy bag to collect fecal matter from his digestive tract. Green Haven provides him with only five colostomy bags a week, forcing him to reuse them. Mr. Mazzio must wash his fecal matter from the bag in his cell sink using ungloved hands and reconnect the used bag to an open wound in his stomach. This practice is not only unsafe for Mr. Mazzio, but also for patients who interact with him. Mr. Mazzio further reported missing insulin doses due to an ability to find a pusher to take him to the medical unit on multiple occasions and that correctional officer responses to emergencies can take 10 to 20 minutes after yelling for help. (See Mazzio Dep. 95:10-96:17; 98:2-102:23; 82:7-9; 107:6-20; 43:17-44:10; Ex. 53.)

- **Alonzo Jacobs (vascular necrosis, degenerative changes in his back, muscle spasms, and degenerative disease in his shoulders).** Mr. Jacobs suffers from chronic pain. His pain was managed for years on opioids, those were discontinued and despite a pain management doctor's recommendation that he be restarted on a low dose. Mr. Jacobs's chronic pain thus goes untreated. Mr. Jacobs needs to wear special-order boots, but Green Haven has not replaced the boots since 2010. The boots are now 11 years old and the heel is completely torn off one of the boots. (See Venters Rpt. 21-22; [Ex. 54 at 22, 23, 32-35, 57, 60-63, JP 1-4; Ex. 44 Deposition of Alonzo Jacobs (Jacobs Dep.) at 33:14-34:4, 67:12-69:14, 128:10-18, 154:18-155:24.)

- **Robert Shedrick (severe neuropathy, falls, diabetes, hypertension, high cholesterol, nutritional disorders).** Mr. Shedrick suffers from severe neuropathy in both legs due to poorly controlled diabetes. He is wheelchair dependent but has not been assessed by a physiatrist. He suffers from falls and has been waiting for his leg braces to be replaced for over two years. (Ex. 55 at 7-12; Ex. 48 Deposition of Robert Shedrick (Shedrick Dep.) 154:7-20, 155:19-22, 156:8-157:8, 91:17-92:25, 156:2-7.)

*Patients housed outside the former UPD.* There are also many examples of patients housed outside C-4 Company who suffer due to receiving inadequate health care and no reasonable accommodations. These example cases establish (a) that Green Haven routinely denies C-4 placement to individuals who need it; (b) that, as a result, these disabled men are housed in units that lack handicap-accessible toilets, showers, and other basic facilities; (c) that, predictably, these men suffer debilitating and dangerous falls; (d) that Green Haven categorically denies access to "pushers" to all wheelchair-bound patients who live outside C-4

Company, regardless of medical need; and (e) that, because these men are unable to wheel themselves to sick call or medication windows, they are unable to adequately access medical care and medications.

- **John Pierotti (wheelchair-bound, asthma, neurogenic bladder, neuropathy, hepatitis C, chronic pain, spasms, hypertension, and arthritis).** Mr. Pierotti was previously housed in E-Block, where he suffered at least one fall in his cell due to ambulation issues and the inability to bring his wheelchair into his cell. In September 2021, he was moved to C-1, where he is still unable to wheel his wheelchair into his cell due to its narrow doors, unlike C-4 company, which has wider doors to fit wheelchairs. Mr. Pierotti made multiple requests for a pusher, but all of them were denied. Mr. Pierotti reported that the exertion required to wheel himself through the facility would make him "see spots" and lose his breath. Mr. Pierotti fell again in October 2021, hitting his head. Green Haven has repeatedly denied Mr. Pierotti's requests for C-4 housing and a pusher. (See Ex. 51 at 1-7;Venters Rpt. 15-16.)

- **Mali Wilkerson (sickle cell disease, vascular necrosis of his hips, and persistent mobility issues).** Mr. Wilkerson is currently housed in J-Block, where he is denied access to a handicap-accessible shower and has been denied a pusher. An orthopedic surgeon noted that Mr. Wilkerson was "unable to propel wheelchair due to arm weakness and pain." Mr. Wilkerson has recently suffered at least two documented falls, one requiring a trip to the emergency room. Mr. Wilkerson has difficulty showering, ambulating, and performing activities of daily living, but his recent requests to be transferred to C-4 have all been denied, despite that his provider has also requested such transfer. (See Ex. 61 at 15-18, 24-25, 27-30, 34-499 Ex. 75 at 1313-1339; Venters Rpt. 16-17.)

- **Seuk Yoon (wheelchair-bound, rheumatoid arthritis, bradycardia, diabetes, and ischemic heart disease).** Mr. Yoon requested to be housed in C-4 Company, but the request was denied. Mr. Yoon reports that he has fallen in his cell several times in E-Block, where the showers are not handicap-accessible. He reports that he sometimes misses his medications due to being unable to get to the clinic. He also reports that he sometimes eats very little due to his inability to manage his tray in the mess hall with his hands, which a rheumatologist described as being affected by "advanced, deforming" rheumatoid arthritis. Mr. Yoon has missed his medications four to six days per month from July through September of 2021 and it takes him months to see a provider. On one of the days he missed his medication, September 3, he ended up in the clinic due to chest pains. (See Ex. 62 Ex. 62 at 9-12, 17-18, 21-23, 25-37, TM 1-4; Ex. 72, Declaration of Seuk Yoon.)

- **Everett Reed (prostate cancer, chronic kidney disease, aortic insufficiency, hypertension, severe cardiomyopathy, severe degenerative back changes, chronic radiculopathy, shoulder tear, and urinary incontinence).** Mr. Reed should be housed in a UPD setting as he not only has mobility issues but also requires medical surveillance. As one nurse noted, he is "not medically

debilitated enough for medical parole," but he is also not fit for general population. Yet, Mr. Reed is currently housed in E-Block, a general population unit with no medical presence. (<u>See</u> Ex. 63 at 1, 8-12.)

- **James Pallonetti (uncontrolled hypertension, hepatitis C, sleep apnea, vertigo, chronic back pain, gastritis, chronic pancreatitis, cirrhosis, varicose veins, asthma, and ambulation issues).** Mr. Pallonetti is housed on E-Block but suffers from frequent hospitalizations due to his chronic conditions. He has fallen on multiple occasions, despite using a rolling walker, and cannot get to the medication windows for his morning and sometimes afternoon medications. He often misses his hypertension medications causing extreme blood pressure readings and concomitant medical issues. (<u>See</u> Ex. 60 at 11-19, 23-49, 52-59 TM 1-13; Venters Rebuttal 11-12.)

In the last few years, at least 12 patients filed grievances asking to be housed on C-Block (the former UPD) due to their serious ailments and disabilities. (<u>See</u> Ex. 75.) For example, they complained of lack of access to showers and toilets, as well as the lack of hand bars or rails needed to ambulate safely when unable to use a wheelchair (such as to get inside of their cell because the wheelchair cannot fit inside). Some of these grievances discussed falls that the patient had suffered due to these inaccessible facilities. All 12 grievances were denied. Of those 12 men, several subsequently had to be transferred to an RMU, which Dr. Venters concluded could have been prevented by timely transfer to a housing unit with on-unit medical presence like the former UPD. (Venters Rebuttal 18.) Two patients were eventually admitted to C-4 at a later point. But several of these patients remain housed in inaccessible units at Green Haven where they continue to be deprived of wheelchair-accessible cells, toilets, sinks, and showers, and where they are categorically denied access to wheelchair pushers. (<u>See</u> <u>id</u>.)

Making things worse, since the UPD was abolished, Green Haven lacks any policy or procedure for determining whether a given patient requires UPD accommodations. Instead, the housing decision is made subjectively by Dr. Bentivegna, the Facility Health Services Director. Dr. Bentivegna admitted that he makes "subjective judgments" whether to grant or deny these

requests, and that he does so without examining any patients. Dr. Bentivegna explained that "it's like art. I know it when I see [it]." (Bentivegna Dep. 247:14-248:25.)

For each of these chronically ill and disabled men—those who currently live on C-4 and those who live outside it—Dr. Venters concluded: "The facilities and care provided by the former UPD, including the on-site administration of medication and emergency response, is the required level of care for [their] medical and disability problems" and that "without it, [they are] being denied the community level of care leading to the predictable risk of preventable pain, suffering, and mortality." (Venters Rpt. 14, 15, 16, 17, 18, 19, 21, 22.)

### iv. Several deaths at Green Haven demonstrate the significant issues due to the lack of a UPD.

Recent deaths at Green Haven also demonstrate problems with the delivery of health care and inadequacies that might be addressed with a functioning UPD. Several decedents with severe medical problems and disabilities did not receive timely assessment and care—the precise risks that the UPD had alleviated.

- **J.M. (HIV, renal disease, Type II diabetes) died of late-stage bile duct cancer after several lapses in care.** On December 2, 2020, J.M. was seen for an overdue physical exam and the provider noticed he was jaundiced. Before that encounter, J.M. had not been seen by his provider for 10 months, since February 2, 2020, and though labs were run on September 26, 2020, he was not seen afterwards. He was admitted to Westchester Medical Center on December 4, 2020, where he was diagnosed with late-stage bile duct cancer. He died a month later. Though the death was deemed to be from "natural causes," Dr. Venters concluded that "there is no question that had J.M. been followed more closely, his deterioration would have been detected earlier and his opportunity for care, including palliative care, would have been accelerated." (Ex. 65 at 5, 7-9, 14-25; Venters Rpt. 23.)

- **Raul Nunez (lower back pain, dramatic weight loss, ambulation issues) died of pancreatic cancer after months of desperate pleas for help.** Mr. Nunez submitted multiple sick call slips detailing his pain and medical symptoms in April of 2019. When he received no response, he filed a grievance and wrote letters to DOCCS officials. In June 2019 his sick call slips became more desperate, including, "I have been communicating my back pain for over 4 months. I have lost over 25 pounds. I have lost [sic] of appetite . . . I have a vein on my leg swollen and looking purple with lots of pain . . . my mobility has become difficult . . . how much suffering do I have to

go through. I need to see a[n] outside Doctor. Now. Please help me." On June 26, 2019 Mr. Nunez was finally transferred to a hospital. He died two months later of pancreatic cancer. Dr. Venters concluded that "[h]ousing on a specialized unit, such as the UPD, is the necessary level of care for a patient like Mr. Nunez to ensure proper medical care and attention" and that "Mr. Nunez's death is another indicator that patients experience prolonged and painful worsening of their medical problems up to and including the outcome of death." (Ex. 66 at 4-26; Venters Rpt. 24.)

- **R.T. died of Green Haven's failure to conduct a basic examination after multiple reports of chest pains.** R.T. complained of chest pains at 2:20pm on April 24, 2016. He was taken to the clinic but was returned to his cell, possibly as soon as within 15 minutes. DOCCS's Medical Review Board found that the nurse's assessment was "insufficient" and did not include a physical examination. The nurse did not conduct an ECG nor request a follow up with a provider. The next day, R.T. was seen at block sick call, but again no physical examination was conducted, nor was an ECG done. R.T. was found unresponsive in his cell at 4:15pm and pronounced dead at 4:58pm. Dr. Venters concluded that "[h]ousing on a specialized unit, such as the UPD, is the necessary level of care for a patient like [R.T.] to ensure proper medical care and attention." (Ex. 67 at 3-14; Venters Rpt. 25.)

- **Jeffrey Glanda died on the UPD of an apparent overdose**. The medical response time to Mr. Glanda's emergency was 20-30 minutes. An officer reported him alive at 4:40 yet found him unresponsive at 5:47 am. A defibrillator (AED) was not turned on until 5:54am. When the AED instructed the officers to apply "breaths" they realized they did not bring the BVM and had to go and get it. The nurse in the clinic was told to report to C-4 at 6:00am making it more than likely medical response did not arrive for 20-30 minutes after the officers' response. Formerly, a nurse was stationed on the UPD overnight which would have ensured the quick deployment of the AED and mask. (Ex. 84 at 5, 17-23.)

When the UPD was in place, UPD-housed patients received quarterly medical reviews, medication reconciliations, and functionality assessments from the UPD physician and a physiatrist. (Venters Rebuttal 14.) By contrast, Dr. Venters found, "many of the death reports I reviewed from the Medical Review Board suggest that the serious issues faced by these patients were not addressed until the very end of their lives, which unnecessarily subjected these men to substantial increased pain and suffering." (Id.)

### v. Reinstatement of the UPD would remedy the ongoing deficiencies in medical care at Green Haven.

Dr. Venters concluded that "[b]ased on the[] concerns about current denials of care for people with health problems and disability, it is essential that DOCCS and Green Haven restore the UPD" because "there is no excuse for failure to identify and provide care for this cohort of vulnerable people consistent with the community standard of care." (Venters Rpt. 44.) Dr. Venters acknowledged Green Haven's "genuine operational concern" that dedicating staff to the UPD would divert resources from the general population. (Id. at 45.) But Dr. Venters explains that this is a problem of implementation that can be addressed to ensure the efficient use of medical staff. And, indeed, the Consent Decree permitted such flexibility in the allocation of medical staff. (See Consent Decree II.A.4(e) (nursing staff reallocation).)

### 4. Defendants' expert overlooks the crucial need for the UPD.

Defendants' expert, Dr. David Thomas, is a former health official for Florida's prisons. He now routinely appears as an expert in litigation challenging health care conditions in prison, typically for the defense. He testified for Louisiana in a class challenge to the health care conditions at its Angola prison, contending that the health care there met constitutional standards. The district court disagreed, upholding the challenge and striking Dr. Thomas's opinion in part. See Lewis v. Cain, 2017 WL 4782653, at *1-2 (M.D. La. Oct 23, 2017); Lewis v. Cain, 2021 WL 1219988, at *59 (M.D. La. Mar. 31, 2021) (finding Eighth Amendment, ADA, and RA violations following bench trial). He also testified for California in a class challenge to, among other things, health care conditions in the state's prisons, again contending that health care conditions met constitutional standards despite massive overcrowding. The three-judge district court overseeing the case disagreed, finding in the process that Dr. Thomas's opinions were "unpersuasive for several reasons" and that some

were "both internally inconsistent and patently incredible."  Coleman v. Schwarzenegger, 922

F. Supp. 2d 882, 946 (E.D. Cal. & N.D. Cal. 2009), aff'd Brown v. Plata, 563 U.S. 493 (2011).

In this case, Dr. Thomas contends that restoration of the UPD is wasteful and

unnecessary because it will focus resources on a limited group of patients.  (See Ex. 41

Deposition of Dr. David Thomas (Thomas Dep.) 313:1-314:1.)  Dr. Thomas contends, without

support, that this will detract from medical care for others at Green Haven, and notes that the

restoration of the UPD would be particularly problematic in light of a supposed ongoing

shortage of health care workers for prisons.  But Dr. Thomas concedes that not all patients at

Green Haven suffer from the same level of illness, that some of the sickest patients are on the

former UPD, and that other sick patients are housed on E-Block, a unit that is not accessible to

the disabled, because of its proximity to the medical clinic, even if they have disabilities that

would be alleviated if they lived on the UPD.  (See Thomas Dep. 140:3-11; 149:24-150:6;

209:15-211:18; 211:21-213:8; 267:5-16).  Indeed, at deposition, Dr. Thomas suggested that E-

Block, which is across the hall from the medical clinic, could theoretically be retrofitted to

become accessible to the disabled and could benefit from on-site medical care, implicitly

recognizing the benefits of a functioning UPD.  (Thomas Dep. 267:5-16; 310:7-14.)  The

reality at Green Haven, however, is that E-block cannot accommodate the disabled, sick and

infirm patients forced to live there and suffering as a result, and the only accessible cell block

is on C-Block far from the clinic, making the need for on-site medical care even clearer.

Regardless, Dr Thomas's opinion should be struck because, among other reasons, it is

infused with his view of the legal standards that govern the provision of health care in prisons,

relies at its core on conclusory statements and "impressions" about the quality of health care at

Green Haven and the effect of restoring the UPD on health care at Green Haven overall, and

depends on cherry-picked deposition testimony that Dr. Thomas concedes reflect his judgments as to which testimony to give more weight than others.  (See, e.g., Thomas Dep. 33:3-7; 250:1-252:8; 295:14-16.)  This is patently improper for an expert.  See Nimely v. City of New York, 414 F.3d 381, 398 (2d Cir. 2005); SLSJ, LLC v. Kleban, 277 F. Supp. 3d 258, 280 (D. Conn. 2017) ("[An] expert may not simply recite a factual narrative from one party's perspective, granting it credibility, when he has no personal knowledge of the facts addressed.").  Likewise, Dr. Thomas's assertion about Green Haven's inability to hire sufficient staff is made without evidentiary basis, and, in any event, is no defense to the failure to provide adequate health care particularly when hiring merely at the level called for by DOCCS's own guidelines would allow the UPD to be fully-staffed.  See infra I.B. (caselaw establishing that staffing deficiencies are not a defense to constitutionally inadequate care).

5.     **Green Haven recently institutes changes contrived to improve its position in this litigation.**

Since discovery started following the Second Circuit's remand and appointment of substitute class counsel, it appears that Defendants began implementing certain incremental improvements.  First, at Superintendent Miller's direction, Green Haven changed its policy with regard to cell-access by C-4 prisoners during recreation time.  Green Haven's prior practice of "locking out" wheelchair-bound prisoners during recreation time—something that would have been contrary to the Consent Decree (see Consent Decree XVII.I.)—prevented them from accessing self-carry medications and addressing personal hygiene issues, including catheterizations.  Second, Green Haven finally completed the renovation of the wheelchair accessible showers on the UPD.  And third, Green Haven has suggested it will reinstate the emergency call-bell system in C-4 in the hopes of improving the response time in cases of emergency.  However, the call bell system has been jerry-rigged with only one operational call

bell connected and the light-up board positioned across the reception area is yards from the officers who should be alerted. (Venters Rpt. 31-33; Dovlatyan Decl. Exs. 125-26, 129-30.)

While these token measures constitute improvements, they are neither permanent nor adequate. As Superintendent Miller explained, he (or his successor) could freely undo these policy changes at any time. (See M. Miller Dep. 79:3-80:1.) Indeed, Green Haven previously did just that by eliminating the UPD not long after the Consent Decree was terminated. As Plaintiffs will further establish at an evidentiary hearing, all of the Consent Decree's UPD requirements, including those at issue here, are necessary and narrowly drawn so as to remedy Defendants' violations of Plaintiffs' rights to adequate medical care and accommodations.

## LEGAL STANDARD

The Prison Litigation Reform Act ("PLRA") allows prison officials to seek termination of prospective relief, including if the court that ordered the relief did not make certain findings when doing so. 18 U.S.C. § 3626(b)(1)-(2). But the PLRA also provides that the prospective relief "shall not terminate" if the court makes findings based on the record "that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." Id. § 3626(b)(3). Thus, when prison officials seek to terminate a consent decree, "the district court must allow the plaintiffs an opportunity to show current and ongoing violations of their federal rights." Benjamin v. Jacobson, 172 F.3d 144, 166 (2d Cir. 1999) (en banc).[3]

---

[3] The PLRA does not require that the "current and ongoing violation[s]" of federal rights be identical to those alleged in the original complaint. If the Court concludes that it does, however, Plaintiffs respectfully request leave to amend the complaint accordingly.

**ARGUMENT**

The UPD-related provisions of the Consent Decree should not be terminated.

Defendants argue that there are no current and ongoing violations of federal rights at Green

Haven. But the discovery taken to date demonstrates exactly the opposite. First, Green Haven

fails to provide adequate medical care to its most vulnerable patients, in current and ongoing

violation of the Eighth Amendment. Second, Green Haven fails to provide reasonable

accommodations to patients with disabilities, in current and ongoing violation of the

Americans with Disabilities and Rehabilitation Acts. And, as to the remedy, the Consent

Decree's UPD-related provisions are narrowly drawn to correct these violations and are the

least intrusive means to do so. First, the UPD is a ready remedy, having been previously

operated for years. Second, much of the UPD's physical infrastructure is still in place and

ready to be put back to good use. And third, a UPD-type system is a more efficient and

economical means of providing care for sick and disabled patients, preventing the need for

costly hospitalization or RMU admissions over time. The PLRA provides that the Consent

Decree "shall not terminate" under these circumstances. 18 U.S.C. § 3626(b)(3). Defendants'

termination motion should be denied.

**I.      Defendants are violating Plaintiffs' Eighth Amendment rights to constitutionally
         adequate medical care.**

Since Defendants dispensed with the Consent Decree in 2015 and dismantled the UPD,

the medical care (or lack thereof) provided to sick and disabled prisoners violates their Eighth

Amendment right to be free of "cruel and unusual punishments." U.S. Const. amend. VIII.

"The basic legal principle is clear and well established . . . that when incarceration

deprives a person of reasonably necessary medical care . . . which would be available to him or

her if not incarcerated, the prison authorities must provide such surrogate care." Langley v.

Coughlin, 888 F.2d 252, 254 (2d Cir. 1989.)  There is no question that adequate care includes

necessary medications, medical supplies, and access to medical professionals.  There is an

Eighth Amendment claim when a prisoner shows "deliberate indifference to [his] serious

medical needs."  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v.

Gamble, 429 U.S. 97, 104 (1976)).  Under this standard, a prisoner must show that his or her

medical condition is objectively serious and that defendants acted with deliberate indifference

to it.  Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003).

The "objective" first element of this standard evaluates the seriousness of a prisoner's

medical condition by considering "whether a reasonable doctor or patient would perceive the

medical need in question as important and worthy of comment or treatment"; "whether the

medical condition significantly affects daily activities;" and "the existence of chronic and

substantial pain."  Id. (quotations omitted); see also Chance, 143 F.3d at 702 ("The standard

for Eighth Amendment violations contemplates a condition of urgency that may result in

degeneration or extreme pain.") (quotations omitted).

The "subjective" second element is met when the defendant "act[s] or fail[s] to act

while actually aware of a substantial risk that serious inmate harm will result."  Salahuddin v.

Goord, 467 F.3d 263, 280 (2d Cir. 2006).  But, critically, a "reckless official need not desire to

cause such harm or be aware that such harm will surely or almost certainly result.  Rather,

proof of awareness of a substantial risk of the harm suffices."  Id.  The Second Circuit has long

recognized that "a series of incidents closely related in time [] may disclose a pattern of

conduct amounting to deliberate indifference to the medical needs of prisoners."  Todaro v.

Ward, 565 F.2d 48, 52 (2d Cir. 1977) (quotation omitted).  "When systematic deficiencies in

staffing, facilities or procedures make unnecessary suffering inevitable, a court will not

hesitate to use its injunctive powers." Id. (citations omitted). Evidence of a substantial risk that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," such that the defendant had been exposed to such information or must have known about it, "could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Farmer v. Brennan, 511 U.S. 825, 842-43 (1994).

The record shows that the deliberate-indifference test is satisfied, both for Plaintiffs housed in the former UPD (C-4 and C-1 Companies) and for sick and disabled prisoners housed in other Green Haven units but who require UPD-type facilities and medical care.

### A. Plaintiffs suffer from serious medical conditions presenting a serious risk of harm, satisfying the objective prong.

Defendants do not dispute that patients with chronic illnesses and disabilities face substantial risks of pain, suffering, or mortality if inadequately treated. (See Ex. 33, Deposition of Dr. Lester Silver, November 15, 2021 (Silver Dep. 2) 189:7-22 (current C-4 prisoner Demetrio Lifrieri has serious health problems); id. at 205:22-206:1 (Mali Wilkerson, a wheelchair-bound prisoner denied C-4 placement has serious health problems); Bentivegna Dep. 199:1-25 (same); id. 158:12-19; Ex. 34, Deposition of Billie Tuohy (Tuohy Dep.) 144:4-12.) The medical issues here run the gamut of serious health problems, including heart disease, arrhythmias, bowel and bladder incontinence, bradycardia, chronic kidney disease, chronic pain syndrome, diabetes, heart disease, Hepatitis C, hypertension, neurogenic bladder, prostate cancer, rheumatoid arthritis, sickle cell disease, and vascular necrosis. Many of these patients are wheelchair-bound due to these ailments, as well as paraplegia, and physical disability. (Venters Rpt. 12-23.) Dr. Venters also concluded that the "myriad of serious health problems among the patients profiled in [Dr. Venters's] report represent conditions that, when

untreated, can result in preventable death" and that "this prisoner population faces a higher risk of acute events, such that the need for rapid emergency response is necessary." (Id. at 31.)

Overall, the discovery taken so far, including from the expert review of medical records and the admissions of Green Haven's own medical staff, establishes that many patients at Green Haven suffer from objectively serious medical conditions that present a substantial risk of serious harm, pain, or mortality, thereby meeting the objective prong of the Eighth Amendment deliberate indifference standard. See supra B.3.ii.-iv.[4]

**B.** **Defendants deny Plaintiffs adequate medical care for Plaintiffs' serious medical needs, satisfying the subjective prong.**

The record also establishes the subjective prong of deliberate indifference. Defendants voluntarily eliminated the UPD remedies specifically designed to address the serious medical needs of Green Haven's elderly, ailing, and disabled patients. Green Haven put these patients back into a system that repeatedly and reliably fails to adequately address those serious medical risks and conditions. And, Defendants utilize an ad-hoc, inconsistent, and informal system to decide who may be housed in the accessible facilities of the former UPD, routinely denying such housing to prisoners who require it while consistently leaving half of these cells vacant. Both of these failures establish deliberate indifference to the serious medical needs of Green Haven's most vulnerable patients.

***Defendants eliminated the UPD but failed to provide a replacement.*** Defendants are well aware of the risks presented by the serious medical needs of Green Haven's prisoners.

_____

[4] As Plaintiffs will address in the next phase of the litigation, the issue of incomplete and unusable medical records must be resolved. (See Curran Declaration.) The deficiencies affect patient care sometimes with harmful results. (See also Ex. 62 at 14 (these records have never appeared); Ex. 60 at 8 ("I have looked the entire chart and inactive charts report of colonoscopy not available.").)

For over 30 years, the provision of medical care at Green Haven, including the UPD, was organized under the Consent Decree. The Consent Decree set out detailed medical processes and procedures, staffing requirements, and facilities, among other requirements, that were designed by the then-parties to provide, when complied with, constitutionally adequate medical care to Green Haven's prisoners. The Consent Decree thus alerted Defendants, to an uncommon degree, to the particular medical needs and risks of Green Haven's population, which the Consent Decree specifically sought to remedy. Indeed, under circumstances in which the serious medical needs of prisoners have been addressed by a long-standing consent decree, like here, the Second Circuit has held that deliberate indifference may be found by the defendant's "failure to remedy serious violations to which it had long been alerted." See Benjamin v. Fraser, 343 F.3d 35, 51 (2d Cir. 2003), abrogated on other grounds by Caiozzo v. Koreman, 581 F.3d 62, 70 (2d Cir. 2009); see also Cagle v. Sutherland, 334 F.3d 980, 987 (11th Cir. 2003) (consent decree is "relevant to the deliberate indifference inquiry").

And moreover, not only are Defendants well-alerted to these risks by the long history of the Consent Decree, but there is also no dispute that Green Haven's medical staff knows that Plaintiffs suffer from serious medical conditions presenting substantial health and safety risks. (See, e.g., Silver Dep. 2 at 189:7-22 (Mr. Lifrieri has "serious ailments"); id. 205:22-206:1 (Mr. Wilkerson has "serious medical conditions"); Bentivegna Dep. at 53:23-54:3 (UPD patients are "at a higher risk of falling"); id. 199:1-25 (Mr. Wilkerson has "a serious illness"); id. 158:12-19 (Green Haven houses patients "that suffer chronic illnesses"); Tuohy Dep. 144:4-12 (Green Haven houses patients who "are of advanced age or are disabled and have ailments associated with advanced age or disability").) Further, DOCCS reports show that from 2018 through 2020 Green Haven patients filed at least 1,017 grievances for inadequate medical care.

(Ex. 77.)  And, in addition to these formal grievances, medical administrators received at least 2,088 complaint letters between 2018 and 2019 from Green Haven patients about problems with their medical care. (Id.; Ex. 76 (sample of complaint letters).)  Yet, despite knowing of these risks and consequences, Green Haven eliminated the UPD and put its most vulnerable and ailing prisoners back into a centralized system of medical care that makes it predictable that—without a specialized housing unit with on-site care—patients with serious ailments and disabilities will not receive adequate medical care.  And Green Haven continues to reject the UPD even as it sees the unconstitutional deterioration and suffering of the sick and disabled prisoners in its system.

As Dr. Venters concluded, "The centralized model of care now in place at Green Haven, in which medications or sick call, or other necessary elements of health care, is not provided in prisoner housing units such as the former UPD, makes it predictable that patients with disabilities or who have serious medical problems will not receive adequate access to health care" and that, "in fact . . . such patients are not receiving adequate access to health care." (Venters Rpt. 3-4.)  Examples of patients suffering violations of their rights, include:

- Demetrio Lifrieri's months-long delays in seeing a provider and inability to get care when suffering chest pains. (Ex. 49 at 28-33, 35, 37-39, 41-42, 47-51, 53-54.)

- David Rhodes's long delays in seeing a provider, missed medications, and emergency response times for chest pain. (Ex. 50 at 44-47, 49-50, 52-53, 57.)

- Ramel Christian's inability to get adequate catheterization supplies despite his history of chronic infections. (Ex. 52 at 6-15.).

- Eugene Mazzio's many missed insulin doses and appointments due to the inability to get to the medical unit, his unattended falls, and inadequate supply of colostomy bags. (Ex. 53 at 5, 12-14,17-18, 20-21, 23, 32-33, 35, TM 1-3.)

- Seuk Yoon's months' long delays in provider appointments, missed medications due to being denied a pusher, and being unable to wheel himself to the clinic or handle his food in the mess hall.  (Ex. 62 at 9, 11-12, 15, 17, 23, 24, 25, 28-32, 34-37.)

- James Pallonetti's missed medications and frequent hospitalizations due to being unable to ambulate himself to the medication window with his rolling walker. (Ex. 60 at 9, 11-19, 25-30, 36-49, 52, 54-60, TM 1 -13.)

- J.M.'s death from late-diagnosed bile duct cancer after receiving virtually no medical care at Green Haven in the year before his death. (Ex. 65 at 5-9, 14-21.

- Anthony Green's missed insulin doses with resulting ever-increasing blood sugar readings. (Ex. 64 at TM 1-3.)

- Raul Nunez's death of pancreatic cancer after months of pleas for medical help. (Ex. 66 at 4-23.)

(See also Venters Rpt. 12-25, Venters Rebuttal 6-18 (analyzing many of the above patients).)

Each of these failures shows the need for the same system of medical care: As Dr. Venters concludes, each of these patients requires "[t]he facilities and care provided by the former UPD, including the on-site administration of medication and emergency response." (See, e.g., Venters Rpt. 14.) Without a UPD-type unit, these patients are "being denied the community level of care leading to the predictable risk of preventable pain, suffering, and mortality." (See, e.g., id.) Dr. Venters also explains that the many barriers to obtaining care for a patient on the UPD—the need to interact with correctional staff, the need for a pusher, the distance to the clinic, the time involved—inevitably leads to patients self-rationing care, such that the failures to provide care are likely undercounted. (See Venters Rebuttal 6-13.)

Dr. Venters concluded that the deaths at Green Haven are "another indicator that patients experience prolonged and painful worsening of their medical problems up to and including the outcome of death," and that "[h]ousing on a specialized unit, such as the UPD, is the necessary level of care . . . to ensure proper medical care and attention" for these patients.

(Venters Rpt. 23-25.)  As discussed above, this "disclose[s] a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners."  Todaro, 565 F.2d at 52.[5]

Green Haven abolished the UPD with full knowledge of these risks and knew that ending the UPD would leave the UPD's patients to suffer.  See supra B.1.  For example, a nurse representative reported that "[the] nursing staff is fearful" that the removal of nursing care from the UPD will lead to "an untoward event."  (Ex. 24.)  But Defendants do not appear to have taken these warnings seriously—or even considered them.  Two weeks after the above warning of the risk of "an untoward event," the nursing representative followed up to say that he had received no response to his inquiry and bemoaned the "insidious creep" by which the UPD was being dismantled.  (Ex. 24.)

To the extent Defendants had a rationale for dismantling the UPD, it appears to have been motivated by Green Haven's post-termination staff shortages and a desire to "mainstream" disabled and chronically ill prisoners by forcing them to make do without any accommodations (a rationale that Dr. Venters states is "exactly contrary to the community standard of care and pose[] a risk to the health and safety of these individuals").  (Venters Rpt. 6-7.)  But it is well established that staffing shortages—Defendants' main rationale—equate only to a lack of adequate resources and can never be a defense to the denial of adequate health

---

[5] Defendants effectively concede the existence of these barriers to medical care and access to medication because Green Haven places many of its most medically vulnerable (yet not viewed as fully disabled) patients in E-Block, which is the housing block located closest to the medical unit.  (See Tuohy Dep. 200:6-201:4; 234:9-18.)  But, as Dr. Venters recognized, this practice does not constitute adequate provision of medical care for seriously ill or disabled prisoners because, as an example, "if there are no wheelchair pushers to get them to sick call or medication lines, that the medical unit is next door may be of no value to them beyond providing a faster response time in the case of an emergency."  (Venters Rebuttal 10.)  Ironically, and unfortunately, patients that Defendants do determine to be disabled are housed in C-4 Company, far from the medical unit and without nearby access to medical personnel in the event of an emergency, creating further barriers for Green Haven's most disabled patients.

care.  E.g., Detainees of Brooklyn House of Detention for Men v. Malcolm, 520 F.2d 392, 399 (2d Cir. 1975); Todaro, 565 F.2d at 52 & 54 n.8; Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980).[6]  And, Defendants' desire to "mainstream" this group of patients was similarly inappropriate given the constitutional violations they suffer both on the UPD and off it.

Defendants eliminated the UPD and replaced it with . . . nothing.[7]  That Defendants did so after being required under the Consent to operate the UPD for decades, and then failed to provide any replacement, is a "failure to remedy serious violations to which [Defendants] had long been alerted," Benjamin, 343 F.3d at 51, establishing deliberate indifference.

***Defendants deny housing in the former UPD to disabled prisoners who need it, while leaving accessible cells vacant***.  Defendants routinely require disabled and wheelchair-bound prisoners to live in dangerous and non-wheelchair-accessible housing.  When the UPD was in place, UPD placement decisions were made in formal meetings by an interdisciplinary committee in which applications were discussed and decisions were documented so as to reach a "consensus of opinion as to whether an inmate would benefit or not and whether they were an appropriate candidate for the unit."  (Silver Dep. 2 at 143:11-144:8.)

Many ailing and disabled prisoners in Green Haven request to be housed in the former UPD because the cells are large enough to fit a wheelchair inside the cell and because it has

---

[6] To the extent Defendants rely on Green Haven's "certification" by the American Correctional Association ("ACA") as proof of constitutional compliance, (see M. Miller Dep. 44:18-24; Tuohy Dep. 29:7-24), such reliance is misplaced.  As the Supreme Court stated in Wolfish, the recommendations of these professional groups do not establish constitutional norms, "rather they establish goals recommended by the organization in question."  Bell v. Wolfish, 441 U.S. 520, 543 n.27 (1979).  Indeed, Plaintiff's expert attempted, as here, to rely on ACA "certification" in a prior case, where the Court nonetheless found a constitutional violation.  Lewis v. Cain, 2021 WL 1219988, at *59; see also Thomas Dep (296:18-297:19) (conceding that ACA standards are a "minimum" and not necessarily sufficient).

[7] In fact, Green Haven staff were instructed not to use the term "UPD" and were reprimanded when they did.  (See, e.g., Ex. 81-82.)

wheelchair accessible showers.  These facilities are necessary for prisoners who suffer from physical or medical disabilities, for example:  The accessible showers and toilets reduce the risk of falling; the larger cells allow for basic personal hygiene and wheelchair access; and on-unit food drop off eliminates the need to wheel oneself to the mess hall three times a day.

Yet, today, decisions on requests for housing in the former UPD are not made according to any written criteria,  policies or standards.  (Tuohy Dep. 203:2-12; Ex. 38 Deposition of Marlyn Kopp (Kopp Dep.) 33:19-34:3, 51:8-54:6.)  These decisions instead are made by the Facility Health Services Director, Dr. Bentivegna, who admitted that he (a) does not personally examine any patients; (b) has not visited the former UPD in over a decade; (c) does not know whether the showers outside the former UPD are wheelchair-accessible;[8] (d) that when faced with a request to transfer to C-4 Company, he just asks himself whether the prisoner is "functional enough" in his current housing without "major" problems—which he answers without talking to or examining the patient; and (e) that his evaluation is "like art.  I know it when I see [it]."  (Bentivegna Dep. 248:20-25.)

This system predictably results in patients who should be housed on the UPD being denied.  As set out above, Dr. Venters identified several patients who needed C-4 placement but whose transfer requests were denied, with three eventually being transferred to RMUs.  See supra B.3.iii.  Dr. Venters opined that the three people later sent to an RMU, and others like them, "who deteriorate in general population until they meet the admission criteria for an RMU, experience preventable pain and suffering that could be significantly addressed were they housed in a functioning UPD" and "some of these admissions to an RMU are likely

---

[8] They are not, as confirmed by Plaintiffs' Rule 34 inspection of Green Haven conducted by Dr. Venters, which Plaintiffs will demonstrate at an evidentiary hearing.  (Dovlatyan Declaration.)

preventable, as are hospitalizations and deaths, if patients receive the care they need in a UPD setting." (Venters Rebuttal 18.) This inconsistent, unreliable, and subjective method for assigning prisoners to be housed in Green Haven's only accessible housing, coming after the Defendants' long experience with the Consent Decree's careful approach, establishes Defendants' deliberate indifference to these patients' serious medical needs.

Even worse, Defendants are denying these requests not because the UPD is full—indeed, half of the cells in the former UPD are left empty and unused. (See Tuohy Dep. 243:14-19; see also Ex. 35, Day Dep. 88:24-89:7 (only half the cells on C-4 Company are currently occupied).) That Defendants, having dismantled the UPD, deny requests to be housed in the former UPD without consulting any policy or written standards, while many accessible cells in C-4 remain vacant, constitutes deliberate indifference to the serious pain and suffering many prisoners suffer from being denied necessary housing.[9]

After having long been made aware of the needs of Green Haven's disabled and seriously ill patients and the Consent Decree's practical UPD-based solutions for addressing them, Defendants eliminated those solutions simply in favor of reverting these prisoners into

_____

[9] Some Green Haven officials have noted that candidates for C-4 housing must be screened for security risks by non-medical staff. Of course, the security of the vulnerable inmates in C-4 is of paramount importance—and indeed, security screenings were conducted even when the UPD was in place. (See Ex. 83.) UPD committee meetings discussing security issues relating to candidates for admission).) But Defendants cannot simply point to vague "security concerns" to justify ad-hoc denials of C-4 placement. As an example, Superintendent Miller suggested that Green Haven does not want sex offenders on the unit, (M. Miller Dep. 185:15-186:3), but seemed unaware that there were already at least three patients convicted of such offenses on the unit. See Wolfish, 441 U.S. at 540 n.23 (deference should be given to prison security concerns unless they "have exaggerated their response"). The security rationale is further undermined by Dr. Bentivegna's admission that he sometimes takes the liberty of placing inmates on C-4 without first obtaining security clearance. (See Bentivegna Dep. 293:17-295:16.) Security concerns only reinforce the need for objective and documented criteria for UPD admissions (including security considerations).

their normal system for the provision of healthcare and, often, into inaccessible housing. The barriers presented by this system, which Defendants appear to acknowledge, result in inadequate medical care and inappropriate facilities for these prisoners, increasing the risk of predictable suffering and mortality. Defendants' failure to remedy this problem despite being well aware of a ready solution, which they eliminated without any adequate replacement, constitutes deliberate indifference under the Eighth Amendment.

## II.    Defendants are violating the Americans with Disabilities Act and the Rehabilitation Act.

The abolition of the UPD in favor of a series of ad-hoc practices in which sick and disabled prisoners housed in and out the former UPD are routinely denied necessary access to medical care is also a violation of their rights under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA). First, disabled patients living in the former UPD are denied on-site medical care and must rely on an unreliable system of "pushers" to wheel them to faraway areas to access medical care. Second, and worse, disabled prisoners living *outside* the UPD are *both* denied on-site medical care *and* categorically denied wheelchair pushers, leading to the predicable result that prisoners who cannot push themselves are left without any medical care and without medication. Third, and worse still, those disabled prisoners who live outside the former UPD—in housing areas that Green Haven admits are not ADA compliant— are denied accessible housing via an ad-hoc, inconsistent, and subjective process, as discussed above, all while the former UPD remains half empty.

In the Second Circuit, ADA and RA claims are "treat[ed] . . . identically." Wright v. New York State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016) (citation omitted). Courts apply a burden shifting framework in which, to make out a prima facie case under either statute, a plaintiff need only show that "1) he is a qualified individual with a disability; 2)

DOCCS is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from DOCCS's services, programs, or activities or DOCCS otherwise discriminated against him by reason of his disability." Id. (citation omitted). Once that showing is made, the burden shifts to the defendant to show "that the proposed accommodation would cause [the defendant] to suffer an undue hardship." Wright v. New York State Dep't of Corr. & Cmty. Supervision, 242 F. Supp. 3d 126, 135 (N.D.N.Y. 2017).

A. **Plaintiffs have met the "light burden" of proving that DOCCS denies its disabled patients meaningful access to medical services.**

Plaintiffs satisfy the elements for a prima facie violation of the ADA and RA such that they need only meet the "light burden of production as to the facial reasonableness of" their proposed "accommodation." Wright, 831 F.3d at 76. Plaintiffs are indisputably qualified individuals with disabilities, and, as demonstrated below, are being denied reasonable accommodations for their disabilities.[10]

1. **Plaintiffs are qualified individuals with disabilities.**

There can be no serious dispute that Plaintiffs are qualified individuals with disabilities. Under the ADA, such a person is defined as a person with a disability who, regardless of whether reasonable accommodations are provided for that disability, "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131. And a "disability" is defined broadly to include anyone who has "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or is "regarded as having such an impairment." 42 U.S.C. § 12102(1); see also id. § 12102(2) (articulating a similarly broad

---

[10] The second element—whether Defendants are subject to the ADA and RA—is not in dispute. See also Ramirez v. Bernstein, 2020 WL 7230729, at *7 (S.D.N.Y. Dec. 7, 2020).

definition of "major life activit[y]," including "caring for oneself, performing manual tasks . . . walking . . . concentrating," and even "thinking").

Even a cursory review of the class representatives establishes that they are qualified individuals with disabilities. Most are wheelchair-bound, and the long list of ailments across the group reflect nearly every -pathy, -osis, and -itis imaginable, including, as discussed above, heart disease, arrhythmias, diabetes, chronic kidney disease, epilepsy, polyneuropathy, vascular necrosis, sickle cell disease, arthritis, cardiomyopathy. And, of course, the UPD—the "Unit for the Physically Disabled"—was specifically designed to meet the needs of Green Haven's patients with disabilities. There can be no serious dispute that the disabled prisoners housed in the former UPD or housed elsewhere at Green Haven have a qualifying "disability." There can also be no serious dispute that medical care and other basic elements of care, like showers, provided by the state-owned, operated, and funded Green Haven qualify as "services . . . programs, or activities provided by a public entity." Id. § 12131(2); see, e.g., Fleming v. City of New York, 2019 WL 4392522, at *17 (S.D.N.Y. Aug. 27, 2019).

### 2.     Plaintiffs are being denied reasonable accommodations.

It is also clear that Plaintiffs are being denied reasonable accommodations for their disabilities. This test is met when a person with a disability "as a practical matter was denied meaningful access to services or programs," including medical services, "to which he or she was legally entitled." Wright, 831 F.3d at 72 (internal quotation marks and citation omitted). Indeed, "The hallmark of a reasonable accommodation is effectiveness," and "meaningful access requires just that . . . *meaningful* participation." Id. at 72-73. The record shows that both prisoners with disabilities housed in the former UPD and elsewhere in Green Haven are being denied reasonable accommodations.

First, as to the disabled prisoners currently housed on the former UPD, Green Haven's current system fails to "overcome structural impediments and non-trivial temporal delays that limit access." Id. at 73. In the UPD, these individuals received medications, supplies, and medical care on unit. Without the UPD, however, patients now routinely miss medications due to a lack of pushers or other inability to get to the medical clinic, miss supplies, and can go months without seeing a medical provider. (See supra B.3.ii-ii.) As Dr. Venters found, the myriad of serious health problems among patients profiled in his report represent conditions that, when untreated, can result in preventable death. (Venters Rpt. 31.) For example, one individual went 10 months without seeing a provider and was subsequently diagnosed with late-stage cancer, which resulted in his death less than a month later. (Ex. 66.)

In addition, when the UPD existed, it was equipped with an emergency call-bell system and a nurses' station on the unit. This emergency-response system was critical for the population housed on the UPD, who, to put it mildly, "face[] a higher risk of acute events[.]" (Venters Rpt. 31.) This system was removed for five years and replaced with nothing, despite the unit continuing to house disabled individuals and despite being among the farthest units from the clinic. Green Haven officials admitted that it costs virtually nothing to maintain the call-bell system, and could provide no explanation as to why it made sense to disconnect a functioning system that cost nothing to maintain. (M. Miller Dep. 146:8-149:15.) Indeed, even Defendants' expert conceded at deposition that the call-bell system made sense to restore. (Thomas Dep. 139:1-10.). The only recourse for emergencies are correctional officers with rudimentary CPR training. (Venters Rpt. 33; Day Dep. 100:6-10, 156:21-157:8.) The result is predictable: delay in emergency response to the most vulnerable population. Indeed, patients consistently testified that it takes between 10 and 30 minutes for correctional officers to

respond, and much longer for medical personnel to respond, if they respond at all. (See, e.g., Mazzio Dep. 43:17-44:10; Heggs Dep. 68:8-15.) In one instance, a patient suffered a gangrene infection in his groin and laid in his cell passed out for three days straight without anyone checking in on him or noticing. (Mazzio Dep. 20:20-23, 38:15-39:16.)

Second, for disabled patients housed outside the former UPD, the record similarly shows that these patients face all of the same challenges, and as shown supra B.3.ii.-iii., these patients are systematically denied handicap-accessible toilets, showers and other basic facilities contained on the former UPD. Far from the individualized assessments made by an interdisciplinary committee under the Consent Decree's UPD provisions, access to these facilities is determined by officials who have no training on the requirements of the ADA and no policy or procedure setting forth criteria for granting the accommodations. (Bentivegna Dep. 227:8-24.) In what can only be called an example of irony, many of these patients are placed on E-Block, which has no accommodations for physical disabilities, because they are so sick that they need to be near the medical clinic.

**B.    Defendants will not be able to prove undue hardship.**

There would be no undue hardship to Defendants by restoring the UPD. The Second Circuit has emphasized that defendants must show that they "would be unduly burdened by allowing" plaintiffs the reasonable accommodation. Wright, 831 F.3d at 78. This burden cannot be satisfied by reference to broad "polic[ies]," or "blanket ban[s]." Id. at 76-77. Nor can the hardship be premised on "mere speculation, stereotypes, or generalizations about individuals with disabilities." Id. at 78. Undue hardship is a fact-specific inquiry in which a defendant must present contemporaneous evidence showing that their denial was predicated on a determination that the "requested accommodation would (a) impose undue hardship on the operation of" the relevant "service, program, or activity, or (b) require a fundamental or

substantial modification to the nature of the" service, program, or activity.  <u>Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.</u>, 804 F.3d 178, 190 (2d Cir. 2015).

Defendants cannot do that here.  Defendants have adduced no evidence that the UPD imposed any undue hardship on the provision of medical care at Green Haven.  Nor have Defendants adduced any evidence, other than their say-so, that Green Haven's provision of medical care to its patient population as a whole will be impaired if the UPD were restored.  Instead, Defendants oppose restoration because they see it as "tak[ing] a nurse away from the rest of the population to go to [the UPD]."  (M. Miller Dep. 167:13-20.)  But this zero-sum game between disabled patients and the general population is a strawman.  It is not backed by any individualized inquiry into the medical needs of the disabled patients at issue, but rather the testimony of employees who admit that they did not conduct any such evaluation.  (Carey Dep. 52:10-19; 53:20-23.)  And it relies on the incorrect premise that Green Haven's duty to provide disabled patients meaningful access to adequate medical services can be ignored so long as those patients have the same on-paper access as their able-bodied counterparts.  Neither is consistent with the the ADA's or RA's requirements, and neither constitutes undue hardship in this Circuit.  <u>See</u>, <u>e.g.</u>, <u>Dean</u>, 804 F.3d at 191 (finding no undue hardship where the "record [was] devoid of evidence indicating whether Defendants evaluated [the considerations they raised] in determining the reasonableness of the accommodations sought").

Further, Defendants' staffing shortages strawman improperly tries to excuse withholding of staff from patients who need it by pointing to yet another violation— Defendants' failure to retain adequate staffing in the first place.  If Defendants met the Consent Decree's staffing requirements, or even DOCCS's own staffing guidelines, which are essentially the same, then staff allocation would not present any issues.  As the former Nurse

Administrator described, Green Haven's crises in staffing posed "detrimental" risks to patients, and "could possibly. . . lead to a death . . . ." (Carey Dep. 103:2-22; 118:7-11.) Of course, one way to fix this problem, which Green Haven's rank-and-file staff would prefer, is to "hire more nurses." (Carey Dep. 130:18-131:1). As Deputy Superintendent Tuohy testified, "I would love to be fully staffed. That's probably my main goal." (Tuohy Dep. 166:21-22.)[11] Plaintiffs agree—reasonable accommodation requires ensuring adequate staffing, not allocating staff away from the sick and disabled patients who need it most.

The record here shows that the UPD's dismantlement was based on the very speculation, stereotyping, and generalizing about the needs of disabled people proscribed by the Second Circuit. See Wright, 831 F.3d at 78. For example, one DOCCS official opined that abolishing the UPD would "move forward with expecting the [disabled] patients to program, and function like any other incarcerated patient," and "empower the handicapped to be independent, and as self-sufficient as possible with the vision of smooth re-entry to the community." (Ex. 30 at 1 ( "[p]ushing themselves to the clinic area . . . will maintain the upper body strength needed for independent living once they parole.").) As Dr. Venters explained, this medically-unsound thinking poses obvious risks to the health and safety of the patients in this vulnerable population. (Venters Rpt. 7.) And, the "record is clear that DOCCS has engaged in no [individualized] assessment" of disabled inmates' "personal circumstances" as to their need for the UPD's facilities, which "runs counter to the clear language and purpose of the ADA," and is a "violation" itself. Wright, 831 F.3d at 77-78.

---

[11] While Defendants acknowledge the staffing issues Dr. Bentivegna also recently agreed to allow two of his providers to perform "extra duty" hours at another facility when his own facility is so understaffed it takes 2-3 months for providers to see patients. (See Ex. 80.)

Overall, Green Haven puts its sick and disabled patents in a cruel system: They can be housed closer to medical care (in E-Block), or they can have accessible housing (in C4 Company). But many patients clearly require both. And, the UPD provided both, through on-unit medical care and accessible facilities. By refusing to restore the UPD, Green Haven denies its patients reasonable accommodations in violation of the ADA and RA.

## III.   The UPD provisions are narrowly drawn under the PLRA.

The UPD-related provisions of the Consent Decree remain necessary to remedy ongoing violations of Plaintiffs' federal rights, are narrowly drawn to achieve that result, and are not unduly intrusive. Under the PLRA, the consent decree therefore "shall not terminate." 18 U.S.C. § 3626(b)(3). "[A] remedy may require more than the bare minimum [federal law] would permit and yet still be necessary and narrowly drawn to correct the violation." Handberry v. Thompson, 446 F.3d 335, 346 (2d Cir. 2006). And "[a] remedy may be deemed to be properly drawn if it provides a practicable 'means of effectuati[on]' even if such relief is over-inclusive." Id. The Consent Decree's UPD aspects meet these requirements and economically and efficiently provide necessary healthcare to highly vulnerable patients.

First, the UPD is necessary to ensure disabled prisoners at Green Haven receive constitutionally adequate medical care. The UPD fills a critical gap in the healthcare system at Green Haven, ensuring that elderly, chronically ill, and disabled prisoners are able to receive an appropriate and necessary level of care, in disability-accessible facilities. As discussed above, among other aspects, the UPD entailed nurse staff stationed there at all times, ensuring adequate emergency response, and an on-site physician one day per week, providing access and continuity of care for complex medical issues and chronic pain management. Such on-unit care is a practical means of providing care to disabled prisoners in the UPD and ensuring adequate emergency response. (Venters Rpt. 31.) And, the Consent Decree also allows for

flexibility in staffing.  (See Consent Decree II.A.4(e).)  Restoration of the UPD is a narrowly drawn means of remedying the violations here, as specialized units providing on-unit medical care are increasingly recognized as efficient and economical for the provision of necessary medical care to elderly, seriously ailing, and disabled prisoners, saving money over time and reducing costly hospital and RMU admissions.  (See supra A.3., B.3.i.; Venters Rpt. 11-12.)

Second, the Consent Decree's UPD procedures allow for flexibility and set out practical means of ensuring adequate access to medical care and accessible facilities.  For example, the Consent Decree requires an Interdisciplinary Committee to meet monthly to review administration of the UPD, make UPD admission and discharge decisions, and develop and review UPD policies and procedures.  (See Consent Decree XVII.C.)  Such a committee is necessary to remedy the now arbitrary nature of UPD admissions and Green Haven's ad-hoc and policy-less determinations for access to accessible facilities and adequate care, as discussed above.  Such requirements are not unduly intrusive, but instead provide flexibility to devise appropriate protocols, policies, and procedures.  Cf. Armstrong v. Newsom, 484 F. Supp. 3d 808, 849 (N.D. Cal. 2020) ("Requiring Defendants to comply with certain conditions when crafting [a remedial] plan does not violate the PLRA . . . ."); Dodge v. Cty. of Orange, 282 F. Supp. 2d 41, 89 (S.D.N.Y. 2003).

Third, the UPD is necessary to ensure compliance with the ADA and Rehabilitation Act.  The UPD requirements provide accessible facilities, including accessible cells, showers, and related accessibility equipment, such as shower chairs and exercise equipment, and they required access to appropriate vocational or educational programs.  (See supra A.3; Consent Decree XVII.G.)  These provisions simply provide necessary and practical accessible facilities

and are designed to provide reasonable access. They are therefore narrowly drawn and the least intrusive means to correct such violations. See Handberry, 446 F.3d at 348.

In addition, not only are the UPD's facilities and means of care a practical and increasingly leading corrections approach to addressing the needs of disabled and seriously ailing prisoners, but, under the circumstances of this case, restoration of UPD is *a fortiori* practical and reasonable under the PLRA. The UPD was previously in place at Green Haven for decades. It is not a new, unknown, or untested remedy. Virtually all of its physical infrastructure—the nurses' station, the examination room, and the call-bell wiring—remains in place and ready to be put back into use. Defendants have presented no evidence that the reestablishment of the UPD would require new physical facilities or would physically intrude upon prison operations. Their only response appears to be that the UPD will divert staffing. But as explained above, Defendants have not shown that the UPD would deteriorate the provision of health care for healthy patients. Nor is such a contention a proper defense, particularly when Green Haven is not achieving the staffing requirements set by DOCCS itself. (See, e.g., Tuohy Dep. 49:25-50:13; 72:3-14.)

The Second Circuit has made clear that "a remedy may require more than the bare minimum the Constitution would permit and yet still be necessary and narrowly drawn to correct the violation." Benjamin, 343 F.3d at 54. In Benjamin, the court rejected prison officials' argument that the PLRA required the district court to conduct, in the context of a window repair program, a "needs-narrowness" inquiry as to whether each individual window could cause unconstitutional conditions if inoperable. The Second Circuit instead concluded that "that the PLRA was intended in part to prevent judicial micro-management" such that "a comprehensive repair program would be more effective and less intrusive than an individual

review of each window at the various facilities." Id. at 53. Requiring Defendants to establish and maintain a specialized unit of care such as the UPD is exactly such "practicable 'means of effectuati[on]' even if [*arguendo*] such relief is over-inclusive." Handberry, 446 F.3d at 346.

Overall, the UPD provisions in the Consent Decree are necessary to correct ongoing violations of Plaintiffs' federal rights, narrowly drawn to serve that purpose, and not unduly intrusive. But, even if Defendants are able to show that a given UPD provision is overbroad, the Court should order the parties to confer on an appropriately narrow remedy. The Second Circuit has held that, after a PLRA plaintiff proves the existence of current and ongoing violations of federal rights, the "prudent[]" thing to do is for the district court to "solicit[] agreement from the parties on appropriate remedies and deadlines for compliance." Benjamin, 343 F.3d at 52. If the parties are unable to reach agreement, this Court should decide the appropriate scope of the relief, including whether to modify the terms of the Consent Decree and ensure a remedy for Defendants' ongoing violations of Plaintiffs' federal rights. See Benjamin v. Horn, 2006 WL 1370970, at *6 (S.D.N.Y. May 18, 2006); see also Dodge, 282 F. Supp. 2d at 86 (S.D.N.Y. 2003). Once the Court finds a violation of a federal right, it must determine a remedy.

## IV.   An evidentiary hearing is required.

The Second Circuit has held that "the district court must allow the plaintiffs an opportunity to show current and ongoing violations of their federal rights" in response to a motion to terminate. Benjamin, 172 F.3d at 166. This rule is compelled by the PLRA's text, which provides that prospective relief "shall not terminate" if the court makes the requisite findings "based on the record." Id. at 165-66 (quoting 18 U.S.C. § 3626(b)(2), (3)). Other circuits have reached the same conclusion—even more so where there are disputed questions of fact. See Hadix v. Johnson, 228 F.3d 662, 671-72 (6th Cir. 2000).

Here, Plaintiffs have adduced a mountain of evidence that proves that there are myriad current and ongoing violations of federal rights at Green Haven and that the restoration of the UPD is an appropriately narrow remedy. Dr. Venters submitted two lengthy reports that unequivocally conclude that the UPD should be restored and that this restoration could be done with minimal burden on Green Haven. Defendants' motion to terminate rests not on any disagreement on the law, but on a different (and inaccurate) understanding of the facts. To resolve this dispute, the Court should conduct an evidentiary hearing. "At a minimum . . . a district court must hold [an evidentiary] hearing when the party opposing termination alleges specific facts which, if true, would amount to a current and ongoing constitutional violation." Cagle v. Hutto, 177 F.3d 253, 258 (4th Cir. 1999); see also Loyd v. Alabama Dep't of Corr., 176 F.3d 1336, 1342 (11th Cir. 1999).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Renewed Motion to Terminate the Consent Decree and hold an evidentiary hearing on the appropriate remedies for the ongoing violations of Plaintiffs' federal rights.


LAW OFFICE OF AMY JANE AGNEW, P.C. WACHTELL, LIPTON, ROSEN & KATZ

*/s/ AJ Agnew*      */s/ AJ Agnew*
Amy Jane Agnew      Jonathan M. Moses
Joshua L. Morrison      Justin L. Brooke
24 Fifth Avenue, Suite 1701   Wilfred T. Beaye, Jr.
New York, N.Y. 10011     Getzel Berger
            Jessica L. Allen
            51 West 52nd Street
            New York, N.Y. 10019

*Counsel for Plaintiff Class*

Dated: January 11, 2022

# APPENDIX 1 — INFORMAL UPD SCHEMATIC

| | Gated Corridor | | |
|---|---|---|---|
| | C-4-22 | C-1-22 | |
| | C-4-21 | C-1-21 | |
| | C-4-20 | C-1-20 | |
| | C-4-19 | C-1-19 | |
| | C-4-18 | C-1-18 | |
| | C-4-17 | C-1-17 | |
| | C-4-16 | C-1-16 | |
| | C-4-15 | C-1-15 | |
| | C-4-14 | C-1-14 | |
| | C-4-13 | C-1-13 | |
| C-4 Gallery | C-4-12 | C-1-12 | C-1 Gallery |
| | C-4-11 | C-1-11 | |
| | C-4-10 | C-1-10 | |
| | C-4-9 | C-1-9 | |
| | C-4-8 | C-1-8 | |
| | C-4-7 | C-1-7 | |
| | C-4-6 | C-1-6 | |
| | C-4-5 | C-1-5 | |
| | C-4-4 | C-1-4 | |
| | C-4-3 | C-1-3 | |
| | C-4-2 | C-1-2 | |
| | C-4-1 | C-1-1 | |
| | Showers | Showers | |
| Gate | Officer's Station | | Gate |
| | Nurses' Station (Vacant) | Doctor's Office (Vacant) | |
| Door | | | |