UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PABLO BERIQUETE, DIOGENES FILPO, MARVIN HOLMES, LAWRENCE LEWIS, LUIS TORRES, MILAN HEGGS, ALONZO JACOBS, and DAVID RHODES, on behalf of themselves and others similarly situated | **ECF CASE** |
| Plaintiffs, | **STIPULATION FOR ENTRY OF MODIFIED FINAL JUDGMENT BY CONSENT** |
| v. | |
| DANIEL F. MARTUCELLO III, Acting Commissioner, New York State Department of Corrections and Community Supervision, and MARK MILLER, Superintendent, Green Haven Correctional Facility | **79-cv-5077 (LAP)** |
| Defendants. | |

This action was brought on September 25, 1979, challenging the provision of healthcare services at Green Haven Correctional Facility ("Green Haven") for violating the federal rights of incarcerated individuals. On December 16, 1980, the Court certified the case as a class action, with the Plaintiff Class consisting of all persons who are or will be incarcerated at Green Haven. Although defendants denied that plaintiffs' rights had been violated, the parties agreed that it was in the best interests of all the parties that the issues be resolved without further litigation. On August 23, 1982, the Court approved and adopted a Stipulation for Entry of a Final Judgment, dated June 23, 1982, and a Supplemental Stipulation, dated August 20, 1982, as the Final Judgment of the Court. The Final Judgment was modified or subject to additional Orders, Stipulations, and Understandings on several occasions, including Orders on August 12, 1983, May 21, 1984, December 3, 1984, September 22, 1986, and October 24, 1988. On September 12, 1991, the Court approved the parties' Modified Final Judgment (the "Consent Order").

In July 2014, Defendants moved to terminate the Consent Order pursuant to Section 802 of the Prison Litigation Reform Act, 18 U.S.C. § 3626, on the basis that the Consent Order was no longer necessary to correct a current and ongoing violation of federal rights. Prior Class Counsel initially opposed the motion and cross-moved to modify the Consent Order. On March 2, 2015, prior Class Counsel withdrew their cross-motion and their opposition to the motion to terminate. On March 4, 2015, the Court terminated the Consent Order.

In June 2016, Samuel Irvin, an absent member of the Class, filed a Rule 60(b) motion, which was denied by the Court and appealed to the United States Court of Appeals for the Second

Circuit. On November 19, 2019, the Second Circuit reversed and remanded on the grounds that there was no viable class representative at the time of dismissal, and instructed that representative Class members be substituted and the Class provided with a renewed opportunity to show current and ongoing violations of their federal rights.

On June 30, 2021, current Class Counsel was substituted, and, on August 2, 2021, the Court substituted Demetrio Lifrieri, Pablo Beriquete, Scott Blue, Diogenese Filpo, Marvin Holmes, Lawrence Lewis, Luis Torres, Milan Heggs, Alonzo Jacobs, David Rhodes, and Mali Wilkerson as representative Plaintiffs for the Class. On August 6, 2021, Defendants renewed their motion to terminate the Consent Order, and, on January 11, 2022, the Plaintiff Class opposed and cross-moved for modification of the Consent Order. The Court stayed the Consent Order during the pendency of the motion to terminate.

In order to avoid further litigation and without any admissions of ongoing and current violations of the Plaintiff Class's federal rights, and having negotiated in good faith for this purpose, the Parties now propose the following proposed Final Modified Judgment by Consent (the "Modified Consent Order").

Solely for purposes of settlement as provided in this Modified Consent Order, Defendants agree that the prospective relief set out in this Modified Consent Order satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A), and shall not object to a finding by the Court that the specific prospective relief set out herein is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary to correct the violations of federal rights alleged by the Plaintiff Class. Defendants agree not to seek immediate termination of this Modified Consent Order during its two-year term on the grounds set out in 18 U.S.C. § 3626(b)(2) or based upon the absence of any other findings of fact by the Court. Except to enforce this Modified Consent Order during its two-year term, this clause shall not be admissible against Defendants in any court for any purpose.

## I.   DEFINITIONS

Unless otherwise stated, the following definitions shall apply throughout this Modified Consent Order, regardless of capitalization:

A.    "Patient" means any Class member seeking or receiving healthcare services.

B.    "DOCCS" shall refer to the New York State Department of Corrections and Community Supervision.

C.    "HUB" shall refer to a region containing multiple facilities and overseen by one Regional Medical Director.

D.    "Green Haven" shall refer to the Green Haven Correctional Facility operated by DOCCS and located in Stormville, New York.

E.    "Defendants" shall mean the Commissioner or Acting Commissioner of DOCCS and the Superintendent of Green Haven, sued in their official capacities.

F.      "Infirmary" shall refer to the Green Haven In-Patient Component, utilized to provide sub-acute non-ambulatory care to Green Haven patients.  The Infirmary may also be referred to as the "Clinic" or "Medical Unit."

G.      "UPD" shall refer to the "Unit for the Physically Disabled" further defined in Section XI herein, and comprised of C-1 and C-4 companies.

H.      "Gallery" shall refer to the area directly outside of cells on any given company within Green Haven.

I.      "Medical Provider" shall refer to a licensed medical doctor, physician's assistant, or nurse who provides medical care to patients.

J.      "Physician" shall refer to a licensed medical doctor.

K.      "LPN" shall refer to a licensed practical nurse.

L.      "Diagnostic Testing" shall refer to laboratory work, biopsies, X-rays, MRIs, CT scans, and similar medical tests.

M.      "HSPM" shall refer to the Health Services Policy Manual promulgated as a collection of policies regarding the delivery of medical health services by DOCCS.

N.      "Active medical record" means the patient health record in current use, also referred to as the "active medical chart" or "active chart."

O.      "Inactive medical record" means the patient health record that has been separated from the active medical record and is stored separately from the active medical record.

P.      "Ambulatory Health Record" ("AHR") refers to the combined active medical record and inactive medical record.

Q.      "FHS1 Records" means the patient health record created and stored on the NYS DOCCS Facility Health Services system.

R.      "Hospital Records" shall refer to records generated by a hospital or equivalent facility not run by DOCCS which memorialize the care, treatment and recommendations for treatment of a patient.

S.      "Block Sick Call" shall refer to the routine sick call currently conducted on the East and West Wings of Green Haven.

T.      "Emergency Sick Call" shall refer to the request for emergency medical attention whether the patient is located in a cell, another part of the facility, or in the Clinic, emergency room, or Infirmary.

U.      "Clinic visit" shall refer to a patient's encounter with a Medical Provider after being sent from sick call, or an emergency call on an urgent but not emergency basis.

3

V.      "Specialty Care" shall refer to those medical encounters with outside specialty physicians who may run clinics in DOCCS' facilities or meet with patients in outside facilities.

W.      "Business Day" shall mean Monday through Friday excluding holidays.

X.      "Chronic illnesses" shall mean the following diseases or diagnoses: asthma, diabetes, hypertension, cancer, seizure disorders, cardiac disease, HIV infections, Hepatitis C, and AIDS.

Y.      "Therapeutic Device" shall mean any item other than dentures ordered for a patient by a healthcare provider to replace a natural body part or to aid a patient in recovery, rehabilitation, ambulation, bodily function or treatment.

Z.      "Full-time" means 37.5 hours per week of service as covered by the Civil Service Employees Association contract or for persons covered by the Professional Employees Federation contract.  "Full-time equivalent" shall mean 37.5 hours per week divided among two or more individuals.

AA.     "Effective Date" shall mean the date on which this proposed Modified Consent Order is signed and given final approval by the Court.

BB.     "Best efforts" refers to a party's obligation to do essentially everything in its power to fulfill its obligation, including, for example, expending significant resources, but does not require balancing resources in a way that would materially harm Green Haven's operations.

CC.     "Quarter" or "Quarterly" shall refer to each three-month period in a calendar year, calculated from the first calendar day of a month to the last calendar day of the third month.  For the avoidance of any doubt, the Quarters referred to herein shall end on the last day of the following months:  March, June, September, and December.


## II.      ORIENTATION FOR CLASS MEMBERS

To ensure that all Class members understand the terms of the Modified Consent Order and their rights thereunder, the parties agree as follows:

A.      Defendants shall make available to each incarcerated individual upon his arrival at Green Haven a notice describing the contents of this Modified Consent Order as annexed hereto as Exhibit A or modified upon agreement by counsel for the parties. Copies shall be available in English, Spanish, and Korean.  Copies of the full Modified Consent Order shall be available in the law library in all three (3) languages as well.  Both sets of materials shall include a detailed summary of the methods by which complaints and grievances about health services can be lodged, including the identity and address of Plaintiffs' Counsel.  Plaintiffs' Counsel shall arrange for translated versions of both documents, and Defendants shall bear the costs of ensuring availability to Class members.  Defendants shall arrange for receipt of Exhibit A in all three (3) translations by current Class members either in paper form or via tablet notification within thirty (30) days of the Execution Date.

B.  Upon intake, a transferred incarcerated individual's active chart must be reviewed as well as all pending specialty referrals or diagnostic testing on the FHS1 system. Pending specialty referrals and diagnostic testing from another HUB shall not be automatically cancelled, but rather a new referral shall be inputted immediately for the Green Haven HUB.  If an incarcerated individual meets with his new assigned provider at Green Haven, and such provider believes in his/her medical judgment that the referral is inappropriate, and the provider has discussed why the referral is being canceled with the patient, the pending referral can be canceled.  The provider must document the medical rationale for the cancelation and all alternative treatment provided in the patient's AHR.

C.  In the event an incarcerated individual who is either: (1) transferred to Green Haven from another DOCCS facility; or (2) arrives at Green Haven as a reception intake individual from a county jail without a current medical chart, clerical staff shall promptly:  (a) create a list of such incarcerated individuals, including their facility of origination; and (b) obtain HIPAA-compliant releases from the incarcerated individual, if necessary, and request the records from the prior facility.  The list of patients who arrived at Green Haven without a chart as described above shall be produced to Plaintiffs' Counsel quarterly.

D.  All prescribed medications for an incarcerated individual who transfers into Green Haven must be prescribed and administered until the patient is seen by his new Medical Provider.  If the Medical Provider determines after physical examination and review of the patient's active chart, along with diagnostic testing, if necessary, to modify, change or discontinue a prescription, a full and legible description of the medical rationale for any changes must be recorded in the patient's medical chart.

## III.  MEDICAL STAFFING

For the purpose of providing timely access to medical personnel for all incarcerated individuals confined in Green Haven, the parties agree as follows:

A.  Defendants shall maintain the following staffing for the delivery of Green Haven medical services:

1.  <u>Administration</u>:

a.  At least one (1) Deputy Superintendent of Health Services ("DSHS") on-site, full-time at Green Haven.

b.  At least one (1) Facility Health Services Director ("FHSD") on-site, full-time at Green Haven.

2.  <u>Medical Services Providers</u>:

a.  At least five (5) non-dental Physicians, each of whom shall be on-site for direct patient care at least thirty (30) hours per week.

5

       b.     At least four (4) physician assistants or nurse practitioners, each of whom shall be on-site for direct patient care at least thirty (30) hours per week.

3.     <u>Nursing Staff</u>:

       a.     At least one (1) Nurse Administrator ("NA") on-site full-time to oversee the delivery of nursing services.

       b.     Within six (6) months of the Effective Date, Defendants shall use best efforts to employ at least a number of full-time registered nurses such that the shortfall against the twenty-six (26) total nursing lines available at Green Haven is equivalent to the average nursing shortfall against recommended staffing nursing lines across all DOCCS facilities (calculated without including Green Haven). The current average nursing shortfall across all DOCCS' facilities is 33.6%. Following this six (6) month period, Defendants shall continue to use best efforts to employ the twenty-six (26) full-time registered nursing lines available at Green Haven. Nothing in this provision may be construed to limit Defendants' obligation to employ an adequate number of registered nurses, including in the event Green Haven's population increases. Defendants shall fill these nursing lines with DOCCS employees, but, if they cannot, may use long-term agency nursing contracts to meet this goal. LPNs can be substituted on a 2:1 ratio for a registered nurse; however, LPNs shall not provide sick call or emergency sick call services.

4.     <u>Medical records and clerical staffing</u>:

       a.     Defendants shall maintain enough clerical staff members to meet the obligations outlined in Section X(B).

5.     <u>Monitoring and Obligation to Confer</u>**:**

       a.     Every quarter after the Effective Date, Defendants shall provide to Plaintiffs' Counsel evidence of all hiring and recruitment efforts made in the previous quarter, as well as a staff roster of current staff, including all DOCCS providers, nursing staff, medical clerical staff and outside contractor staff.

       b.     Every quarter after the Effective Date, Defendants shall provide to Plaintiffs' Counsel information sufficient to explain and break out the calculation of the average nursing shortfall across all DOCCS' facilities, as referred to in Section III(A)(3)(b) above. Responsive materials shall include, but not be limited to, the current DOCCS Department of Health Services Staffing reports or equivalent records.

c.   In the event that Defendants fall short of the staffing guidelines set forth above during the first two quarter reporting periods after the Effective Date, the parties shall confer concerning what further steps Defendants will take concerning recruitment and retention of medical staff at Green Haven and/or alternative solutions to address staffing shortfalls. For clarity, the Parties agree that Plaintiffs will not initiate a contempt proceeding concerning a failure to meet the staffing requirements contained in this Section III until after the parties have proposed and given consideration to alternative or additional hiring efforts under this paragraph.

B.   Defendants shall use their best efforts to reduce reliance on short-term agency, extra service, temporary or other specially employed healthcare staff (other than specialty physicians).

C.   Defendants shall train their medical staff on how to utilize the language lines. Defendants shall provide Plaintiffs' Counsel with a Report of Training Form related to Language Line training every quarter after the Effective Date indicating the attendees. Additionally, Defendants shall post the notice affixed hereto as Exhibit B in all sick call rooms, all clinical rooms, the ER, outside the medication windows, in the SHU examination room, and in all Infirmary rooms.

D.   Defendants shall provide Plaintiffs' Counsel with reports every quarter after the Effective Date of this Modified Consent Order showing the name and position of each member of the healthcare staff, the existence of any vacancies, and the use of any agency, extra service, temporary or other specially employed healthcare staff.

## IV.   SICK CALL

For the purpose of providing access to the healthcare system for all incarcerated individuals confined in Green Haven, the parties agree as follows:

A.   With respect to incarcerated individuals in general population, Defendants shall:

1.   Conduct routine block sick call at least four (4) days per week by a Medical Provider or Registered Nurse trained in physical assessments.

2.   Ensure that each Medical Provider or Registered Nurse who conducts sick call wears a name tag which can be read by patients during the encounter.

3.   Before the Effective Date, Defendants shall add a "sick call code" to the FHS1 system and train all sick call staff on entering each sick call encounter into FHS1, including brief notes in the post-clinic notes section to detail the complaints and/or symptoms of the patient addressed or if the patient is a "no show" or "refusal."On the Effective Date and through the duration of this Modified Consent Order, sick call providers shall make all "sick call code" entries in the FHS1 consistent with the above to memorialize a Class member's sick call encounter.

4.      Provide secure envelopes so every patient can submit sick call slips confidentially on blocks if they cannot get to a secure lock box.

5.      Incarcerated individuals shall be able to request medical permits or medical permit renewals through sick call, with such requests subject to Medical Provider review.

B.      With respect to incarcerated individuals in ICP, SHU, RCTP, and UPD, Defendants shall:

1.      Conduct routine block sick call at least four (4) days per week by a Medical Provider or Registered Nurse trained in physical assessments on the units.

2.      Before the Effective Date, add a "sick call code" to the FHS1 system and train all sick call staff on entering each sick call encounter into FHS1, including brief notes in the post-clinic notes section to detail the complaints and/or symptoms of the patient addressed or if the patient as a "no show" or "refusal."

3.      On the Effective Date and through the duration of this Modified Consent Order, sick call providers will enter sick call encounters in the FHS1 database using the new "sick call code."  In the post-clinic notes sick call providers must enter post-clinic notes consistent with Section VII(E).

4.      Ensure that incarcerated individuals in ICP, RCTP, or UPD who can be safely removed from their cells are examined outside the cell; if an incarcerated individual cannot be removed due to assaultive behavior or another bona fide security concern, ensure that a follow-up examination is conducted as soon as safe to do so.

5.      Ensure that incarcerated individuals in SHU shall be escorted to the Clinic for examination if the Medical Provider or Registered Nurse conducting sick call deems it to be necessary.

6.      Ensure that each Medical Provider or Registered Nurse who conducts sick call wears a name tag that can be read by patients during the encounter.

7.      Provide secure envelopes so every patient can submit sick call slips confidentially on blocks if they cannot get to a secure lock box to independently deposit a slip.

8.      Examine each patient for injuries upon admission to SHU if the patient was involved in a use of force or inmate on inmate assault.

9.      Ensure that incarcerated individuals shall be able to request medical permits or medical permit renewals through sick call, with such requests subject to Medical Provider review.

C.      No incarcerated individuals shall be threatened with disciplinary action, nor subject to same for attending sick call, nor for legitimately seeking access to healthcare services, including services guaranteed by this Modified Consent Order.

D.      In each sick call room and outside the medication line windows, Defendants shall post signs bearing the language in Exhibit C reminding patients of their right not to be threatened with disciplinary action and reporting options for sick call and medication concerns.

E.      For monitoring purposes, Defendants shall produce to Plaintiffs the sick call code reports (by Type Of Service) as created and maintained on the FHS1 system on a quarterly basis.  Within thirty (30) days of the quarterly production of such report, Plaintiffs' Counsel shall have the option of requesting copies of the sick call slips related to up to five (5) days of sick call visits for any given quarter and/or block/sick call location.  Defendants shall produce copies of the related sick call slips as requested within forty-five (45) days of the request.

## V.      MEDICATION ADMINISTRATION

To ensure that patients receive medications in a timely and organized manner, and that compliance is monitored, the parties agree to the following:

A.      Defendants will develop and implement a system for recording no shows or refusals for one-on-one medications and insulin that records the patient, DIN #, medication and any signed refusals in one place.

B.      Defendants will develop and create a system for recording the names of patients who miss more than three dose administrations or blood sugar readings over seven (7) consecutive calendar days and reporting the identity of patients to their respective Medical Providers for prompt follow-up.

C.      Records created in response to Sections IV(A) and (B) will be produced to Plaintiff's counsel every quarter after the Effective Date.

D.      Medications shall not be discontinued until a Medical Provider meets with the patient and discusses the medical justification for discontinuing the medication. This encounter must be recorded in the patient's AHR.

E.      The FHSD and other Medical Providers shall not discontinue medications based on "safety and security" reasons alone.  Medical Providers may consider "safety and security" in determining the mode of administration of treatment provided (for example, by providing medication in liquid instead of pill form), so long as the form of treatment utilized does not affect medical treatment or its efficacy.

F.      All Medical Providers at Green Haven must complete a training on HSPM 1.24A within the first quarter after the Effective Date.  Defendants shall produce a Report of Training Form to Plaintiffs' counsel for each medical provider after the second reporting period.  Any new Medical Providers shall be trained on HSPM 1.24A

within ninety (90) days of his/her start date at Green Haven, and the Report of Training shall be produced to Plaintiffs' Counsel with the next quarter reporting.

## VI.    REFERRALS TO FACILITY MEDICAL PROVIDERS

To ensure that a patient can see his Medical Provider within a reasonable and medically appropriate amount of time, the parties agree as follows:

A.    A patient referred to a Medical Provider from block or emergency sick call shall be seen and evaluated by a Medical Provider on the same day as the referral if the patient is experiencing, or suspected of having, an emergent condition.  A patient referred to a Medical Provider from block or emergency sick call shall be seen and evaluated by a Medical Provider within seven (7) days of the referral if the patient is experiencing, or suspected of having, an urgent condition.  Patients referred to a Medical Provider from block or emergency sick call without an emergent or urgent condition shall be seen and evaluated by a Medical Provider at the next available appointment, which should generally occur within thirty (30) calendar days after referral.

1.    A patient who requires an adjustment to current one-on-one medication prescriptions that cannot be facilitated by a Medical Provider or Registered Nurse at sick call shall be referred to a Medical Provider and seen within three (3) business days of the referral or at the next available appointment, whichever is sooner.

## VII.    SPECIALTY REFERRALS AND APPOINTMENTS

For the purpose of ensuring timely access to specialists, the parties agree as follows:

A.    Defendants shall ensure that average wait times for routine specialty appointments with an optometrist or podiatrist do not exceed ninety (90) days, and average wait times for urgent podiatry or optometry specialty appointments are no more than thirty (30) days.  Defendants shall ensure that average wait times for routine specialty appointments with other medical specialists do not exceed ninety (90) days, and that average wait times for specialty appointments deemed urgent do not exceed twenty-one (21) days.  If an urgent specialty appointment wait exceeds twenty-one (21) days, or the wait is otherwise determined by Defendants to be medically unacceptable, then the patient shall be taken to an emergency medical center for treatment and specialty care.

B.    Patients referred to optometry by a Medical Provider shall not be denied an optometry appointment solely because the patient has been seen by an optometrist within the last two (2) years.

C.    The median waiting period for all patients awaiting specialist consultations, except for optometry and podiatry as detailed in Section VII(A) above shall be thirty (30)

days or less, from the date the consultation is ordered by a Medical Provider to the date the consultation occurs.

D.    If a follow-up appointment recommended by a specialist is denied by Kepro and/or an RMD review, the denial shall be printed off the FHS1 system and stored.

E.    All specialty consultation results and recommendations must be entered into the FHS1 system in the "post-clinic comments" section in a way that memorializes all the recommendations made by the specialty consultant, including medications and/or follow-up appointments. Post-Clinic comments will no longer be left blank, nor will they only partially record impressions or recommendations. If more space is needed than available on FHS1, the inputter shall note: "see consult notes."

F.    Defendants will devise and implement a monitoring system to track whether or not Medical Providers are following the recommendations of specialty providers. This log or recording device must be independent of the contents of a patient's medical chart.

G.    In the event that Defendants are unable to contract specialty services which allow them to meet the medical care delivery markers set forth above, Defendants shall advise Plaintiffs' Counsel of all inadequacies in specialty provider contracting and all efforts to contract adequate services, and shall make all reasonable efforts to provide the needed care to the affected patients in a timely manner. Reporting to Plaintiffs' Counsel shall occur every quarter after the Effective Date.

H.    For monitoring purposes, Defendants shall produce the specialty referral denials or deferrals stored pursuant to Section VII(D) above and the log or recording created pursuant to Section VII(F) above to Plaintiffs every quarter after the Effective Date.

## VIII.  DIAGNOSTIC TESTS RESULTS

For the purposes of ensuring that diagnostic testing and x-rays ordered by Medical Providers are performed and that results are promptly shared with patients, the parties agree as follows:

A.    The Medical Provider shall inform the patient that diagnostic testing will be undertaken, and a patient can receive the results of any completed diagnostic testing at sick call by submitting a sick call slip with a description of the diagnostic test results sought.

B.    If in the Medical Department's judgment, the results should be reviewed with a Medical Provider in person, a referral will be entered with an appointment scheduled within fourteen (14) calendar days.

C.    All diagnostic test results must be entered into the FHS1 system in the "post-clinic comments" section in a way that memorializes the "Impressions" section of any x-ray, MRI, CT, or abnormal laboratory readings, as well as any follow-up recommendations. Post-Clinic comments will no longer be left blank, nor will they

only partially record impressions or recommendations. If more space is needed than available on FHS1, the inputter shall note: "see consult notes."

D.   Upon review of diagnostic test results and the entry of the test results in the FHS1 system, a form shall be sent to the patient indicating the results if no further action is required, or indicating that a Medical Provider visit will be scheduled within a date certain to go over the results and discuss any necessary follow-up. The form to be used for diagnostic test results notice is annexed hereto as Exhibit D.

## IX.   CHRONIC CARE PATIENTS

For purposes of ensuring appropriate care and monitoring of patients with chronic illnesses, the parties agree as follows:

A.   Defendants shall ensure that each Medical Provider, Registered Nurse, and LPN reviews the HSPM and the infectious disease manual upon hiring and on at least a quarterly basis, and completes verification sheets memorializing review. The Nurse Administrator shall maintain the verification sheets.

B.   Verification sheets shall be forwarded to Plaintiffs' Counsel every quarter after the Effective Date.

C.   For patients with chronic illnesses, as defined in Paragraph I(X) above, Medical Providers shall add a chronic care appointment record in the form attached hereto as Exhibit G to the patient's AHR at his next appointment with his Medical Provider. These chronic care appointment records shall be updated at each subsequent provider visit and placed in the front of the chronic care patients' active medical chart and, when complete, moved to the front of the inactive medical record.

## X.   MEDICAL RECORDS

For purposes of ensuring that medical records are complete, accurately reflect each patient's state of health and facilitate continuity of care, the parties agree as follows:

A.   Maintenance Obligations – Defendants shall maintain all medical records pursuant to HSPM 4.01 through 4.05.

1.   Defendants shall ensure that all relevant hospital records are obtained from the hospital and incorporated in the active chart upon return from a hospital visit. The hospital records should include any diagnostic testing performed at the outside hospital and/or prescription recommendations as well as discharge summaries.

2.   Defendants shall ensure that if a patient's medical records arrive with separate records from a Regional Medical Unit that the RMU records are integrated into the patient's active chart or stored with the patient's inactive chart, and not stored separately from the patient's chart.

3.      Any HIPAA release forms received with a request for copies of medical records must be copied and included in the patient's medical record.

4.      Defendants shall conform active individual medical records to the requirements of the DOCCS Directive within six (6) months of the Effective Date.

5.      If DOCCS adopts a fully functioning Electronic Medical Record (EMR) system at Green Haven, counsel for the parties shall meet and confer on reasonable amendments to this Section X to ensure compliance with this Modified Consent Order.

B.      Staffing for Creation and Dissemination of Copies

1.      Defendants must maintain sufficient medical clerical staff to complete all requests or to send out an invoice for all medical records requests within thirty (30) days of receipt of the request.

2.      Defendants must maintain enough personnel working as medical records clerical staff to facilitate patients' requests to review their own medical records within thirty (30) days of receipt of the request.

3.      Defendants must maintain a master list of all medical records requested: (1) by whom; (2) for which patient; (3) the date upon which a request was received; and (4) the date upon which the request was filled. A copy of this list shall be produced to Plaintiffs' Counsel every quarter after the Effective Date.

## XI.    UNIT FOR THE PHYSICALLY DISABLED

To ensure that physically disabled incarcerated individuals have access to the available reasonable accommodations and delivery of medical services at Green Haven, the parties agree as follows:

A.      Defendants shall maintain a Unit for the Physically Disabled ("UPD") at Green Haven with a capacity to provide cell space for at least forty-four (44) incarcerated individuals, four handicap accessible showers, and at least two shower chairs – one on each company. Absent renovation to other blocks creating ADA-compliant cells and amenities, the UPD shall be located on C-1 and C-4 companies.

B.      Defendants shall create and maintain a Facility Operations Manual (FOM) policy that sets out all policies, rules and regulations related to operation of the UPD. The FOM policy shall be available in the law library as well as on the bulletin board outside the C Company officer's bubble and in the officer's bubble.

C.      The cells in the UPD shall be used for the housing of mobility-impaired incarcerated individuals.

D.      Defendants shall establish a UPD Committee that shall meet monthly to discuss and determine the placement or removal of incarcerated individuals from UPD housing. The UPD Committee shall be comprised of: (1) the FHSD; (2) the Deputy Superintendent of Health; (3) the NA; and (4) one other licensed physician from the full-time Green Haven medical staff.  If the UPD Committee determines not to place a patient with a mobility impairment in the UPD, then that patient shall be automatically referred to an appointment with a physiatrist for assessment of whether placement on the UPD is appropriate.  If the physiatrist determines that UPD placement is appropriate, then the prior decision of the UPD Committee shall be modified to place that patient in the UPD.

E.      Defendants shall develop and adhere to criteria, set out in writing, for C-1 placement which shall include consideration of a patient's mobility issues, benefit from handicap accessible showers, and chronic illnesses that benefit from consistent medication compliance.  The criteria shall be published in the FOM policy addressing the UPD for patient reference.

F.      Defendants shall develop and adhere to criteria, set out in writing, for C-4 placement which shall include consideration of a patient's mobility issues, benefit from handicap accessible showers, chronic illnesses that benefit from consistent medication compliance, risk of falls, and potential benefit of a call bell.  Patients who are wheelchair-bound shall be given first priority for C-4 cells.  The criteria shall be published in the FOM policy addressing the UPD for patient reference.

G.      Except in cases of disciplinary action, need for protective custody, transfer to another DOCCS facility, release from prison, medical emergency, or mental health necessity, no patient shall be transferred from the UPD without the consideration and consent of the UPD Committee.

H.      All UPD Committee decisions for both placement and removal of a patient from the UPD shall be documented in the patient's active medical chart. In considering placement or removal, members of the UPD Committee shall consider the patient's active medical chart, observations of the patient by medical personnel, and relevant specialist consultation notes, assessments, and recommendations issued in the past two (2) years.  Denial of UPD placement for a patient with mobility issues shall not be determined solely on the contents of a patient's FHS1 records.

I.      If a Green Haven Medical Provider or an outside specialist recommends consideration of a patient for the UPD, the UPD Committee shall consider such recommendation at its next scheduled meeting. The patient may be housed in the UPD prior to the meeting of the UPD Committee at the discretion of Defendants.

J.      To ensure that UPD residents are compliant with one-on-one medications, insulin shots, blood sugar level monitoring and other necessary medication administration and vital sign monitoring, Defendants will arrange for at least two (2) one-on-one medication delivery encounters conducted by a Medical Provider or Registered Nurse, per day.  The Medical Provider or Registered Nurse will provide any vital

sign monitoring, medication distribution, blood sugar readings, shots, etc., during these encounters.

K.    A Registered Nurse making medication runs in the UPD will have a list of UPD patients and each patient's chronic conditions and any necessary medical monitoring he/she should be conducting.

L.    Defendants shall either arrange for medical supplies to be kept on the UPD, or will arrange for reasonable supply delivery runs to the UPD, not to exceed one such run per week.  Medical supplies shall be reasonably provided, and UPD patients shall not be required to reuse single-use catheters or rinse out colostomy bags.

M.    Every resident of the UPD will receive on company feed up and will not travel to the mess hall for meals unless the patient chooses the mess hall; however, once selected, a patient must maintain his selection of feed up or mess hall meals until adjusted by a Medical Provider with a permit.

N.    Defendants will ensure there is a dedicated cart and porter available for UPD patients to use to move commissary bags and mail packages during callouts for both.

O.    Defendants will ensure that patients housed on the UPD who are using recreation time on the galleries have reasonable access to their cells for purposes of accessing medication, therapeutic and medical devices.  Access to a cell shall not be denied unreasonably and any denials shall be recorded in the log book along with the reason for the denial.  UPD patients shall not be locked in their cells upon entering to attend to personal hygiene for the duration of the recreation period.

P.    Defendants will ensure that recreation time on the UPD is overseen by correctional staff who are physically present on the gallery for the protection and safety of UPD patients.  Security personnel shall not leave the UPD galleries unmonitored during recreation time.

Q.    Defendants will ensure that at least one able-bodied UPD inmate assistant/porter is available on the UPD galleries during all recreation times to assist UPD patients with physical tasks such as cleaning cells or reaching items stored in personal lockers.

R.    Defendants will ensure that a sufficient number of pushers are available during programming and/or callout hours to assist C-4 residents and C-1 residents who have been assigned a pusher to be assisted with ambulation throughout the facility. Correctional staff will record the pushers on duty and available for residents.

S.    Correctional staff assigned to rounds on the UPD shall be trained to look into each patient's cell during rounds, including night rounds.

T.    For monitoring purposes, Defendants shall produce on a quarterly basis after the Effective Date:  (1) a list of all patients housed on the UPD, including cell

placement details and provider assignments; (2) all UPD Committee Meeting Minutes; (3) the lists of patients and relevant medical information described in Section XI(K); (4) UPD log book entries; and (5) any reasonable medical and reasonable accommodation records requested by Plaintiffs' Counsel that Plaintiffs' Counsel has not received in the normal course within thirty (30) days of a request submitted in the normal course for medical or FOIL records.

## XII.   THERAPEUTIC AND MEDICAL DEVICES

To ensure timely delivery or maintenance of therapeutic devices, the parties agree as follows:

A.   Defendants shall maintain at Green Haven adequate stock of standard medical devices that do not need to be specially fitted to a patient, such as catheters and compression stockings of common sizes. To the extent possible, standard medical devices shall be stored in the Clinic for easy access. Defendants shall evaluate inventory needs regularly and shall take into account the current and anticipated needs of the patient population. Standard medical devices shall be provided to patients as soon as possible, and not later than within two (2) weeks of the order

B.   A medical staff member shall be assigned to manage Green Haven's supply of standard medical devices.

C.   Standard wheelchairs ordered for patients shall be delivered to the patient within two (2) months of the order. Custom-made wheelchairs shall be delivered to the patient promptly upon receipt by DOCCS.

D.   With respect to prostheses, custom braces, orthotics, hearing aids, CPAP machines, special issue boots, wheelchairs, and other items requiring fitting, Defendants shall:

1.   Ensure that orders for such devices are issued promptly after a patient is determined by a Medical Provider to need such a device, or the repair or replacement of such a device, and that the devices are provided to the patient promptly upon DOCCS receipt of the device from the vendor.

2.   To the extent possible, utilize clinics within DOCCS to expedite the fitting and referral process for particular specialty devices.

3.   Record and log each order for a specialty device, including the date it was ordered and the specialist or vendor from which it was ordered. The log shall incorporate all pending orders when it is created.

4.   Record and log each "denial" or "deferral" of a medical device requiring fitting recommended by an outside specialist.

5.   Deliver such device to the patient within two (2) months after a Medical Provider determines that such device is necessary, or in need of repair or replacement.

6.      Maintain at all times backup vendors for devices fabricated on a regular basis.

E.      For monitoring purposes, Defendants shall produce the logs described in Sections XII(D)(3) and XII(D)(4) above to Plaintiffs' Counsel on a quarterly basis after the Effective Date.


## XIII.   EMERGENCY MEDICAL RESPONSES

To ensure that all incarcerated individuals at Green Haven receive timely access to a healthcare provider in the event of a medical emergency, the parties agree to the following:

A.      When an incarcerated individual requests emergency medical attention or another incarcerated individual(s) asks for it on behalf of a patient, correction officers responding to medical emergencies shall not wait for a correction superior to respond, but rather shall immediately place a call through to the arsenal and on to the Clinic.

B.      For monitoring purposes, Plaintiffs' Counsel may request the preservation of a fixed-camera video recording of a medical response no more than two times each quarter during the two-year term of the Modified Consent Order, and may subsequently or concurrently request its production.  Defendants shall produce a copy of the fixed camera video within forty-five (45) days of the request, and the video shall be treated as confidential pursuant to the confidentiality orders entered in this action.  Once requested, Defendants shall notify Class Counsel if responsive video does not exist and the request shall not be counted as one of the two available requests.  Unless subsequently agreed to by the parties, any video produced pursuant to this Modified Consent Order shall be used solely for purposes of this case and for no other purposes.  This provision shall not be construed to limit Class Counsel from requesting or receiving video in any other lawful manner.


## XIV.   PATIENT CONFIDENTIALITY

To ensure the privacy and security of patient health information, the parties agree as follows:

A.      Unless requested by a medical provider or judged necessary for security, security staff shall remain sufficiently distant from the place of healthcare encounters, including sick call encounters in Special Housing Units, that quiet conversation between the patient and the healthcare provider cannot be overheard.  During sick call encounters, security staff shall remain outside the threshold of the sick call room unless otherwise requested by a healthcare provider or judged necessary for security.

B.      Defendants shall instruct medical personnel and correctional staff not to discuss a patient's confidential personal health information (PHI) with other incarcerated

individuals, or with personnel who do not have a need for the information. Patients shall not be required to reveal their medical illness or condition to security staff as a condition of requesting emergency sick call, but they can be required to describe in general terms the nature of their complaint and symptoms.

C.      Correctional staff should be reminded on a quarterly basis at lineup that they should not disclose confidential health information of a patient to other incarcerated individuals or to personnel who do not have a need for the information.

## XV.    QUALITY IMPROVEMENT AND ASSURANCE

No earlier than eighteen (18) months after the Effective Date, counsel for the parties shall meet to discuss whether additional quality improvement or quality assurance procedures should be implemented to address any problems in delivery of medical care at Green Haven that Plaintiffs' Counsel then contends were revealed during the first five (5) quarterly monitoring production periods of this Modified Consent Order. Defendants agree to consider proposals from Plaintiffs in good faith.

## XVI.   COMPLAINTS AND GRIEVANCES

To ensure that complaints and grievances about the delivery of medical care are considered and addressed, the parties agree as follows:

A.      Responses issued by the facility to grievances concerning medical care should be substantive and provide medical justification and/or explanation if the grievance is being dismissed without further action, or should detail the actions that will be taken to address the issue raised in the grievance. For example, if a patient complains that he has been denied a wheelchair pusher, the response should explain why a pusher is medically unnecessary or unwarranted. If action is being taken, the response must detail that action and a rough estimate of when it will occur.

1.      Responses issued by the facility are deficient under this Section if, instead of containing the detail referred to in Section XVI(A) above, they state only that the patient is under the care of a medical provider, refer the patient to his medical provider, refer the patient to sick call, or refer to the grievance process as a sufficient response. A response relying on the fact that the patient has had a recent Medical Provider encounter will detail the patient's last Medical Provider visit and explain how the issue raised in the grievance was addressed.

2.      No responses will be issued by the facility that merely list the alleged encounters gleaned from the FHS1 database without review of the patient's active medical chart or consultation with medical personnel that indicate the specific issue was addressed at a Medical Provider or sick call visit and resolution or follow-up is pending.

  B.  For monitoring purposes, Defendants shall produce the Grievance Clerk's Log showing all data related to medical grievances on a Quarterly basis.

## XVII. ADA AND REASONABLE ACCOMMODATIONS

To ensure that disabled patients receive reasonable accommodations consistent with the mandates of the Americans with Disabilities Act:

  A.  All Green Haven medical staff will receive training on individualized assessments and the demands of the ADA at least once per year. The training will include information concerning the needs of incarcerated individuals with serious mobility impairments and the services or programs to which they must be afforded access.

  B.  No medical staff member shall deny medical verification for a reasonable accommodation request without personally examining the patient and discussing his/her needs.  If medical verification is denied, the encounter and the reasons for denying medical verification shall be documented in the patient's AHR.

  C.  For monitoring purposes, Defendants shall produce Report of Training Forms for ADA and individualized assessment training on a quarterly basis to Plaintiffs' Counsel.

## XVIII. MONITORING

In order to facilitate monitoring of Defendants' compliance with this Modified Consent Order, the parties agree to the following:

  A.  To facilitate compliance with this Modified Consent Order, Defendants shall provide to Plaintiffs the disclosures set forth in this Modified Consent Order, including those summarized below.

  B.  The parties shall maintain a system through which the form appended hereto as Exhibit E is made available to and can be completed by incarcerated individuals at Green Haven during the two-year term of this Modified Consent Order. Plaintiffs' Counsel shall supply Defendants with the forms as well as metered envelopes to be used for this purpose, which shall be postage-prepaid and addressed to Plaintiffs' Counsel. These forms and envelopes ("monitoring mailings") shall be placed at the following locations:  (1) adjacent to sick call boxes on each housing block/unit that contains such a box; (2) the Green Haven facility medical Clinic bull pen; (3) the sick call rooms on the East and West Wings or any alternative areas where sick call is conducted outside of the Clinic; and (4) the Green Haven facility law library. The notice attached hereto as Exhibit F shall be posted in the same locations where the forms and envelopes are available for Class member use. The forms shall also be made available upon request to incarcerated individuals housed on blocks/units without a sick call box, such as SHU. Defendants will ensure that class members are able to mail the forms directly to Plaintiffs' Counsel through ordinary facility

channels, and Defendants shall treat the monitoring mailings as legal mail. On at least a quarterly basis, Plaintiffs' Counsel will produce scanned versions of all monitoring forms received from Class members to Defendants.

C.     Defendants will produce the documents referenced in the following paragraphs every quarter after the Effective Date, except that the first production will be due at the end of second quarter after the Effective Date. The parenthetical summaries below are for convenience only, and the more-detailed descriptions in the cited paragraphs control:

1.     Section II(C) (list of patients who arrived at Green Haven without records)

2.     Section III(A)(5) (reports concerning healthcare staffing)

3.     Section III(C) (language line Report of Training forms)

4.     Section III(D) (list of current medical staff, vacancies and use of outside labor sources)

5.     Section IV(E) (FHS1 Sick Call Reports and any sick call slips requested by Plaintiffs' Counsel)

6.     Sections V(A)-(C) (logs concerning medication no-shows and refusals)

7.     Section V(F) (Report of Training for HSP 1.24A)

8.     Section VII(H) (denials or deferrals of recommended specialist appointments and log of specialist recommendation adherence)

9.     Section IX(B) (verification sheets concerning review of guidelines)

10.    Section X(B)(3) (list of requests for medical records)

11.    Section XI(T) (list of UPD patients, UPD Committee Meeting Minutes, Nurses' lists of UPD patients, UPD log books and any reasonable medical records or Reasonable Accommodation records of UPD patients requested by Plaintiffs' Counsel)

12.    Section XII(E) (logs of specialty device orders and denials or deferrals of specialty device requests)

13.    Section XIII(B) (video requested by Plaintiffs' Counsel in normal course)

14.    Section XVI(B) (Grievance Clerk's Logs of medical grievances)

15.    Section XVII(C) (Report of Training forms for ADA and individualized assessment training)

D.     For avoidance of doubt, specification of materials produced by Defendants for

monitoring does not limit Plaintiffs' right to request additional materials in the event of a dispute over compliance with the provisions of this Modified Consent Order, or for the Court to order the production of such additional materials as appropriate.

E.      All materials produced pursuant to this Modified Consent Order shall be subject to the Court's Orders concerning potentially HIPAA-protected materials, and shall be treated as Highly Confidential pursuant to the Court's Confidentiality Orders, unless any given Class member provides the parties' counsel with a HIPAA or institutional records release. This provision concerning confidentiality of records produced shall survive the expiration of the Modified Consent Order.

F.      All materials produced pursuant to this Modified Consent Order shall be used by the receiving party solely for the purposes of this action and shall not be disclosed to third parties or used for any other purpose, unless the records constitute the medical records or administrative records of any incarcerated individual who has provided the parties' counsel with a HIPAA or institutional records release form that is not limited to use for this action.

## XIX.   TERM, ENFORCEMENT, AND DISPUTE RESOLUTION

A.      This Modified Consent Order shall commence on the Effective Date and shall continue for a period of two years.

B.      If Plaintiffs determine that Defendants are not in compliance with a material provision of this Modified Consent Order, Plaintiffs may request a meet and confer with Defendants that specifies the provisions of the Consent Order they contend Defendants are not in compliance with, and any facts supporting their contentions. Counsel shall then meet and confer in an effort to resolve the issue within fifteen (15) days of receipt by Defendants' counsel of such a request.  If the parties then fail to resolve the issue within thirty (30) days of the initial meet and confer, Plaintiffs' Counsel may seek further relief.

C.      If Plaintiffs determine that Defendants are not in material compliance with any term of this Modified Consent Order following the meet and confer process set out above in subpart (C) to this section, Plaintiffs may seek relief from the Court, including, but not limited to, specific performance, findings of and relief for contempt, or any other form of just and appropriate relief.

D.      Consistent with the dispute resolution provisions of this Section XIX(B), claims for contempt due to noncompliance with this Modified Consent Order must be raised through counsel for the Plaintiff Class.  For avoidance of doubt, this provision does not negate or limit any individual Class member's rights or claims to relief as provided by law.

E.      Nothing in this Consent Order shall be read to negate or limit any relief available pursuant to 18 § U.S.C. 3626.

## XX.   ATTORNEYS' FEES AND COSTS

A.   Attorneys' Fees and Costs Award.  Class co-Counsel Law Office of Amy Jane
Agnew, P.C. will make an application for an award of attorneys' fees and costs that
were incurred by the Law Office of Amy Jane Agnew, P.C. that are fair, reasonable,
and appropriate, which may be part of a negotiated settlement to be approved by
the Court; the Court will retain jurisdiction over such an application and to order
and approve an award of attorneys' fees and costs; and the entry of this Modified
Consent Order shall not release Plaintiffs' claims for attorneys' fees and costs.

**WACHTELL, LIPTON, ROSEN & KATZ**

By: _____
Jonathan M. Moses
Justin L. Brooke
Jessica L. Layden
51 West 52nd Street
New York, New York 10019
(212) 403-1000
JMMoses@wlrk.com
JLBrooke@wlrk.com
JLLayden@wlrk.com

**LETITIA JAMES**
Attorney General
State of New York

By: _____
Daniel Schulze
Section Chief and Assistant Attorney General
28 Liberty Street
New York, New York 10005
(212) 416-6557
Daniel.Schulze@ag.ny.gov

*Attorney for Defendants*

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By: _____
Amy Jane Agnew
Joshua Morrison
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com

*Counsel for Plaintiff Class*

**SO ORDERED.**

Dated: February _____, 2024
         New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge